ETHEL A. HANSEN, Appellee, v. FIRST NATIONAL BANK OF DUN-
LAP et al., Appellants.

**FRAUDULENT CONVEYANCES:** Intent to Hinder, Delay, and De-
1 fraud. A conveyance executed and delivered with the mutual intent
on the part of grantor and grantee to hinder, delay, and defraud
the creditors of the grantor is a nullity. Evidence held to show a
fraudulent conveyance by a father to his daughter.

**FRAUDULENT CONVEYANCES:** Estoppel to Question. A creditor is
2 not estopped to attack as fraudulent a conveyance by its debtor
because of the fact that, after the conveyance, it accepts payment
from the grantee of an overdue incumbrance on the property, but
does so with the distinct understanding that it in no manner recog-
nizes grantee's alleged title.

**FRAUDULENT CONVEYANCES:** Insolvency of Grantor—Effect. A
3 creditor who has acquired a lien on property may attack a fraudu-
lent conveyance of such property *without alleging that the grantor is
insolvent.*

*Appeal from Harrison District Court.*—J. B. ROCKAFELLOW,
Judge.

MAY 6, 1924.

ACTION in equity, to quiet title to certain real estate in favor
of plaintiff as against the defendant First National Bank of Dun-
lap, and to have canceled a certificate of purchase issued by the
defendant W. R. Milliman, as sheriff of Harrison County, to said
bank, and to enjoin the issuance of a deed to the certificate
holder. The equities were determined to be with the plaintiff,
and the prayed relief was granted. From the decree entered,
defendants appeal.—*Reversed.*

*Robertson & Havens,* for appellants.

*L. W. Fallon* and *J. S. Dewell,* for appellee.

DE GRAFF, J.—Plaintiff herein alleged in her petition that
she is the owner in fee simple of certain described real estate in

the town of Woodbine, Iowa, and that she acquired her title to said premises by warranty deed from James E. Hansen and wife on August 12, 1921; that the defendant First National Bank of Dunlap, on the same date, but after the execution and delivery of the deed, caused a writ of attachment to be issued from the office of the clerk of Harrison County, in a case entitled First National Bank of Dunlap, Iowa, v. James E. Hansen, and levied upon said real estate; that thereafter the said bank obtained a judgment, and subsequently caused the real estate in controversy to be sold under special execution; that the said premises were sold to the First National Bank, and a certificate of purchase duly issued by the sheriff of said county to the bank; that, unless the defendant sheriff is restrained and enjoined, a deed to said premises will issue to the said certificate holder. Plaintiff prayed that her title to said premises be declared paramount to any claimed right or lien of the defendant bank by virtue of said attachment and sale thereunder, and asks for a decree establishing and quieting the title to said real estate in her, and to set aside the execution sale and cancel the certificate of purchase.

1. FRAUDULENT CONVEYANCES: intent to hinder, delay, and defraud.

To this petition defendants answer, and admit that plaintiff received her title from her father and mother, James E. Hansen and wife, at the time charged, but that the said deed conveying title to the premises was given without valuable consideration, and was executed with the mutual intention on the part of the parties thereto to hinder and delay the First National Bank in collecting its claim and judgment against James E. Hansen. It is further alleged that the First National Bank, on or about September 1, 1921, obtained a judgment in the district court of Harrison County against James E. Hansen, and that upon said judgment execution was caused to issue, and levy made upon the premises described and claimed by plaintiff; that the premises were, by virtue of said execution and levy, sold to the said bank for the sum of $2,500; and that a sheriff's certificate of purchase was issued to said bank. It is further alleged by defendants that, on or about June 1, 1921, a certain promissory note of $6,000, signed by James E. Hansen and wife, payable to the First National Bank, became due and payable, but that the

makers thereof have failed, neglected, and refused to pay the same; that, at the time of the maturity of the said note, James E. Hansen was the owner of the real estate involved herein; and that, by reason of the said indebtedness, the bank caused a writ of attachment to be issued and levied upon the real estate in question, and thereafter secured judgment against James E. Hansen for the amount due on said note, with interest and costs; that the deed executed and delivered by James E. Hansen and wife to this plaintiff was in fraud of the rights of said bank,— and prayed that the said deed be decreed to be fraudulent, without consideration, and void as against these defendants.

To the answer plaintiff filed her reply, specifically denying the allegations of fraud, and pleaded an estoppel against the First National Bank, in that the said bank, with full knowledge of the rights of this plaintiff, accepted from her the payment of a $1,200 note and mortgage on said premises, and that, in the acceptance of said sum and the cancellation of said mortgage owned by the bank, the pleaded fraud was thereby waived, and the purchase and sale of the premises to the plaintiff were ratified and confirmed by said bank.

Two primary questions are presented on this appeal: (1) Was the sale of the premises in question by James E. Hansen to the plaintiff fraudulent,—that is, made without valuable consideration, and with the mutual intent on the part of the grantor and grantee to hinder, delay, and defraud the defendant bank, a creditor? (2) Is the defendant bank, by reason of its acceptance from plaintiff of the payment of a mortgage on the premises subsequent to her acquisition of title, estopped from questioning the validity of the deed? Of these in their order.

The first proposition involves the fact side of this case, and if the question is answered in the affirmative, it is determinative of this appeal. In cases of this character, the difficulty of proof on the part of him who has the burden is both appreciated and appreciable. The essential issue involves the fraudulent intent, and it must be established, not only that the instrument in question was executed and delivered on the part of the grantor with intent to hinder and defraud, but it must be made to appear also that the grantee participated in such intent. *Atkinson v. McNider*, 130 Iowa 281. Although the mere relationship between

the parties to a contract does not *per se* constitute a badge of fraud, courts sense the obligation to scrutinize closely transactions between relatives when a creditor's interests are involved. Therefore, in dealing with this class of testimony, we necessarily, and perhaps unconsciously, give weight to it in the light of experience, and are influenced by the accordance of the evidence offered with facts within the realm of human conduct and experience. The circumstances surrounding the impeached transaction are mute witnesses in the case, and usually are vitally forceful and probatively cogent. We think in terms of their probability, and in the last analysis, the weight to be given the evidence rests, as Greenleaf said, "upon our faith in human testimony, as sanctioned by experience." We naturally ask, Is the proof offered to sustain the issuable fact reasonable,—that is, satisfactory or sufficient? Is it natural,—that is, in conformity to human conduct and experience or to the nature of things? Is the fact sought to be established corroborated? Is there an absence of conflicting testimony? These are the ordinary tests, and consciously or otherwise the human mind makes application of them in determining the truth of the matter in controversy.

What facts does the instant record disclose that sustain or tend to sustain the issue of fraud in the transaction giving rise to this suit? Prior to August 12, 1921, James E. Hansen, the father of plaintiff, was the title holder of certain real estate. On that date he owed the defendant bank $7,200, of which $1,200 was secured by a first mortgage on his town property, and $6,000 by a second mortgage on his 120-acre farm in Shelby County. Upon the maturity of the latter obligation, the bank did not regard the reasonable value of the farm sufficient security for mortgages aggregating $14,400, and for some time had been negotiating with Hansen to secure from him additional protection for the $6,000 debt. Nothing came of this effort on the part of the bank, although Hansen was offered a lower rate of interest if he would place part of the indebtedness on the Woodbine property. It appears that, on the early afternoon of August 12, 1921, he went to the bank and told the cashier that he desired to pay the $1,200 mortgage, but as a condition of payment demanded the delivery of the papers. He was informed that he could pay, and of the amount then due. The cashier

was busy, and apparently unable to locate the papers instantly, and a dispute arose between them. Hansen left the bank without paying. He then proceeded to the office of his attorney, and related his conversation with the cashier. At that time Hansen was angry and somewhat peeved "because he couldn't get his mortgage and his notes." He then instructed his attorney to prepare a deed conveying the title to the Woodbine property to his daughter Ethel, plaintiff herein. The deed was prepared, signed by Hansen and his wife, and handed by the attorney to the deputy recorder, who placed it of record the following day. The plaintiff was not present, nor was any communication made with her prior to the delivery of the deed to the recorder. At this time the attorney was handed $1,300 by Hansen, and a receipt was given, reciting that the moneys were "deposited with me for the purpose of paying the note and mortgage of James E. Hansen to the First National Bank of Dunlap, Iowa, for $1,200 and interest," and to pay revenue stamps, recording fee, and such other fees and expenses as may be necessary in the conveyance of the Woodbine property "this day conveyed to Ethel A. Hansen." The attorney had no personal knowledge of the source of the $1,300 fund. On the same afternoon, the defendant bank, believing that Hansen was about to dispose of the Woodbine property, and that the securities which it held on his indebtedness were insufficient, filed a petition, aided by attachment, to recover on the promissory note of $6,000. This note was, upon trial, reduced to judgment, and on November 26, 1921, the Woodbine property, which had been subject to levy under the attachment, was sold under special execution to the defendant bank for $2,500, and a certificate of purchase was issued to the bank. No foreclosure proceeding was instituted, and no part of the judgment was ever paid.

The plaintiff testified that she knew her father and mother were going to Logan that day; that she knew she had bought the place; but that she did not accompany them, to have the necessary papers executed. It is shown that she was unacquainted with the attorney, had given him no instructions, nor authorized him to accept the deed for her. She does not remember exactly what was said between her and her father prior to the consummation of the deal, but she testified that she was to pay

$1,300 and give her mortgage note for the balance of the purchase price. Ethel was eighteen years old in July, 1921. She had been living at home, and had had no business experience. On the 12th day of August, 1921, she testified that she gave her father $1,300, and in explanation of the source of the money, said that she made "some of it working out. I had some given to me." As to where she kept the money, she stated:

"I had part of it, and part he [father] had in keeping for me. Q. Where did you have part of it? A. Why, in my purse. Q. How much did you have in your purse? A. I don't exactly know. Q. Tell us as near as you can. A. I don't know. Q. And you couldn't give us any idea how much your father had on this day? A. No."

At the time the deed was executed to her, a mortgage for $2,700 was also prepared, taken by the father, and later signed by Ethel and recorded. With respect to this part of the transaction, she was asked, upon cross-examination:

"Did you ever offer to give him this mortgage back? A. I don't know as there was anything said about that. I was to pay him $1,300, and give my note for the rest of it. Q. When was that talked over? A. Why, the 10th of August,—the evening of the 10th."

She did not know how much money she had in her possession, nor could she state the amounts that had been given her in presents, except that she claims that $500 was given to her on her birthday.

"Q. And you haven't earned but a very small amount working out? A. I haven't earned so very much." She could not state how much she had earned. "Q. Tell the judge about how much you earned a week. A. Sometimes more and sometimes less,—an average of about $8.00 a week. Q. You had worked at home until you were of age? A. Most of the time. Q. Well, all the time except not to exceed six months? A. Well, probably about that. Q. How long had you worked out before that time? A. Well, I don't exactly know. Q. A month or so? A. Probably more than that. Q. Well, two or three months? A. Well, I don't know. I hadn't worked out very many months. Q. You hadn't worked out six months altogether, had you? A. No, I don't suppose."

It is further shown that Ethel knew that her father owed the bank, but she claims she did not know the amount of the indebtedness. She also testified that she knew that her father and mother were going to see the attorney on the day that the deed was made, and she also knew that he was going to the bank, but states she did not know that he intended to pay off the mortgage on the Woodbine property, although she knew there was such a mortgage. The testimony of Ethel relative to the consideration paid for the Woodbine property is not quite consistent with the terms under which the conveyance was made, or with the terms specified in the deed. Plaintiff says she took the property subject to the $1,200 mortgage, although there was no definite understanding before the conveyance that she was to give a mortgage for $2,700. The $1,300 which it is claimed by plaintiff she paid her father was used by the attorney to pay the outstanding mortgage, with interest, in the sum of $1,245.65, to pay the recording fee and revenue stamps on the deed, and presumably to pay some fees to the attorney for his services. All of these debts were incurred by the father, and were his debts. The attorney was not employed by the plaintiff, nor had he ever talked with her. One cannot read the record before us without a sincere feeling that the conveyance was not *bona fide.* The proof is far from satisfactory that the deed was given for a valuable consideration. Clearly, it hindered and delayed the enforcement of a lawful indebtedness. The testimony supporting the alleged consideration is unreasonable, and it fails to convince the unprejudiced mind that the deed was given for any other reason than to hinder and delay a creditor who had a just claim against the grantor. We cannot escape the conclusion that the grantee had actual, or at least constructive, notice of the grantor's intent. The plaintiff is not corroborated in any material fact, but on the contrary, her answers clearly indicate the absence of good faith in the transaction. There is no reasonable motive that this young girl at this time should become the purchaser of the incumbered property, nor does the evidence disclose any motive on the part of the father to convey this property to his daughter except to hinder and delay the bank in collecting its debt. He was not called as a witness, and this is a significant fact. After leaving the bank on the day in question, he did not

communicate with his daughter, although he had gone to the bank for the purpose of paying his debt represented by the $1,200 mortgage. He was angry. He did not consider the action of the cashier in failing to find the papers which he demanded as trivial. He told his attorney that he had had trouble at the bank. At first blush, this event may be considered minor; but it reveals a state of mind that would cause some men to do what the grantor did do. Without Ethel's testimony, no court would hesitate to grant the prayed relief to the defendant bank; and unless her testimony establishes the good faith of the transaction, she must fail. There is something more than mere suspicion or inference in this case. The testimony lacks probative force, and we are abidingly convinced that the trial court was in error in determining the equities of the case to be with the plaintiff.

The other propositions involved on this appeal are not necessary to be determined, in view of our conclusion on the facts. In passing, however, it may be said that the subsequent acceptance by the bank of the payment of the $1,200 mortgage does not constitute an estoppel, under the facts and circumstances disclosed. There was no recognition on the part of the bank of title in the plaintiff, and it was immaterial to the bank who paid the money. The mortgage was past due. As a matter of fact, the money was not paid by the plaintiff, but by the attorney, from the $1,300 which he had received from James E. Hansen; and although he notified the bank that Mr. Hansen "had nothing to do with this matter," the bank refused to be bound by such statement, and in reply wrote a disclaimer of her claimed interest. The plaintiff could not acquire superior rights to the bank under its attachment lien by a mere claim, and there is no evidence that tends to show that, in accepting the check in payment of the mortgage, that it was accepted in recognition of her rights in the property. The bank did not in any manner induce the plaintiff to pay this mortgage, nor concede any right to anybody in the acceptance of payment. It had never, expressly or impliedly, admitted the validity of the deed in question. Under these facts, estoppel cannot be invoked.

**2. FRAUDULENT CONVEYANCES: estoppel to question.**

In conclusion, the rights of the appellant bank are not determined or controlled by the fact whether the debtor had other

property remaining, sufficient to satisfy the claims of the bank.

3. FRAUDULENT CONVEYANCES: insolvency of grantor: effect. Whether the grantor had or had not, is immaterial, under the pleadings. On this matter, however, the record is silent. The rights of the bank were prejudiced to the extent that its particular lien in this case was lost if the deed is effective in conveying title to the plaintiff. If a conveyance is executed with intent to defraud a creditor, it does not matter that it would not harm anyone if not voided, by reason of the fact the debtor has other property ample in amount, within reach of creditors; "for a rich man may make a fraudulent conveyance, as well as a poor one." 20 Cyc. 465. No burden was placed upon the appellant to prove that the debtor did not have sufficient property remaining to pay his debts. Plaintiff in no manner questioned the sufficiency of defendant's pleadings. No allegation respecting the insolvency of Hansen was made, and the defendant bank was under no legal obligation, in seeking to set aside a fraudulent conveyance, to allege the insolvency of its debtor. The gist of the action is the intent to hinder and delay the creditor, and it is that intent, coupled with the injury to the creditor, that voids the conveyance. In *Campbell v. Campbell*, 129 Iowa 317, 319, it is said:

"But a voluntary conveyance, even to children, as to whom there may be presumed an inducement by way of love and affection, is constructively fraudulent as to an existing creditor, unless the grantor had remaining after the conveyance sufficient property to satisfy the claims of his creditors; and the burden is on the grantee to rebut the constructive fraud by proving that the remaining property of grantor was sufficient for this purpose."

Accepting, as we do, the views herein expressed on the material issues of this case, the decree entered must be and is—*Reversed*.

Arthur, C. J., Stevens and Vermilion, JJ., concur.