No. 33,463

MILDRED STEPHENSON and EMMA H. STEPHENSON, *Appellants,* v. DICK WILSON et al., *Appellees.*

No. 33,464

MILDRED E. STEPHENSON and EMMA H. STEPHENSON, *Appellants,* v. J. L. HARRIS, Sheriff of Sumner County, *Appellee.*

(76 P. 2d 810)

Opinion filed March 5, 1938.

*Joe T. Rogers* and *James A. Conly,* both of Wichita, for the appellants.

*E. J. Taggart,* of Wellington, *W. L. Cunningham, D. Arthur Walker* and *William E. Cunningham,* all of Arkansas City, for the appellees.

The opinion of the court was delivered by

DAWSON, C. J.: These consolidated appeals are chiefly a sequel to *Wilson v. Stephenson,* 143 Kan. 91, 53 P. 2d 874, in which the administrator *de bonis non* recovered judgment against the defendant Huldah Stephenson for $3,039.42 which had come into her hands as administratrix of the estate of her husband.

Following our affirmance of the judgment in that case, execution issued on 160 acres of Sumner county land standing in the name of Huldah, to satisfy it. The land was sold and the sale confirmed.

After that happened the first of these cases, No. 33,463, was begun by two daughters of Huldah, plaintiffs herein, who alleged that the land which had stood on the record in their mother's name for many years was in fact theirs, under a contract between them and their mother dated in 1928, which contract was followed by a warranty deed dated in 1932, but which was not recorded until 1935.

In their petition the plaintiffs, Mildred and Emma Stephenson, prayed that the confirmation be set aside, likewise the sale, and that the execution be quashed, and that any further levy or execution against the property be enjoined.

After a lengthy trial the district court made findings of fact and conclusions of law to the effect that plaintiffs were not the owners of the property at the time the judgment was rendered against Huldah Stephenson, that the agreement and deed under which plaintiffs claimed the property were fraudulent and void, and that the deed was without consideration and was given for the purpose of hindering, delaying and defrauding the creditors of Huldah Stephenson. Case No. 33,463 is an appeal to this court from that judgment.

The second of these appeals had its inception in the fact that in 1932 Huldah Stephenson owned 25 shares in the Diamond National Bank, of Pittsburgh, Pa. On November 14 of that year that bank became insolvent and passed into the control of the comptroller of the currency, and a receiver was appointed to liquidate it. On September 19, 1934, that receiver filed an action in the district court of Sumner county against Huldah Stephenson to recover judgment on her double liability as stockholder. Judgment was entered in favor of the receiver on August 14, 1935, and execution was issued thereon. To satisfy it, the sheriff, J. L. Harris, levied on the quarter section of land in controversy; and thereupon the plaintiffs, Mildred and Emma Stephenson, brought an action alleging their ownership of the property and praying that the sheriff be enjoined from selling it to satisfy their mother's judgment indebtedness to the receiver of the Pittsburgh bank. The receiver was made a party to that action, and on the issues joined the trial court held, as it did in No. 33,463, that plaintiffs were not the owners of the land, that their mother, Huldah, was its owner at the time the receiver's judgment was entered against her, and at the time the execution levy was made thereon to

satisfy Huldah's judgment creditors. The second of these consolidated appeals, No. 33,464, is from that judgment.

Counsel for appellants present and argue certain assignments of error which will be considered in the order they appear in their brief.

In the trial court it was stipulated that the evidence adduced in case No. 33,463 should be considered in case No. 33,464. On all material matters where the evidence in one case was not germane to the other, the controlling facts are largely matters of record, and none of serious dispute.

The first error assigned is based on a finding of the trial court which reads:

"The court finds that Huldah Stephenson, from the beginning of the administration proceedings, was attempting to defraud the creditors of her deceased husband out of the possibility of obtaining any substantial payment of their claims and that the daughters knew of this and aided her."

Appellants contend that "this is an arbitrary finding not supported by . . . a single inference that could be legitimately drawn." To this contention this court cannot assent. The record is long, but it has been diligently perused; and it fairly justifies an inference that a policy of pretended shifting of title to property between certain members of this Stephenson family to hinder and delay their creditors had been in vogue for many years. Certain written evidence adduced by defendant for another purpose, if accorded any credence whatever, tended to prove that this practice began as early as 1916, when C. N. Stephenson, 13 years before his death, signed a paper purporting to turn over all his property to his wife, Huldah, for which she was "to take care of me as long as I live." And one of these plaintiffs signed that paper as a witness. The evidence tended, however, to show that C. N. Stephenson continued not only to care for himself but also to manage the property in controversy for another dozen years after that ostensible instrument transferring his property was executed—if its date was entitled to any credence, a question which concerned the trial court, not this court. That paper never came to light until Huldah Stephenson was cited to appear in the probate court in February, 1931, to make a true report of the assets of the estate of C. N. Stephenson. And although Mildred Stephenson had witnessed that purported transfer of all her father's property to her mother in 1916, she testified in this case that neither before nor after her father's death did she know of any property owned by her mother except the home place, which was not and is not involved herein.

The basis of the plaintiffs' claim to the ownership of the quarter section subjected to levy and execution as the property of Huldah was a secret oral contract (afterwards reduced to writing), unknown even to other members of the immediate family except one brother who resided with his mother and the two sisters, Mildred and Emma, appellants herein. That contract, when reduced to writing, bore the date of January 7, 1928, and recited in substance that whereas Mildred and Emma had for some time past attained their majority, and that at their mother's insistence and request they had agreed not to marry during her lifetime and to stay at home with her and render her "care, attention, love, kindness and affection beyond that rendered ordinarily by daughters," in consideration of which the mother agreed to convey to them the 160 acres of land now in controversy, and that she would deliver to them a deed to the property on their demand.

The evidence to which the trial court gave credence tended to show that in fact no lawful consideration passed from appellants to Huldah Stephenson in pursuance of their purported agreement. The parties lived together as they had been accustomed to do; they kept a common household fund to which the income of the land contributed as it had done prior to the agreement; and there was no change of possession nor change of exercise of ownership and dominion of the land on account of that agreement.

The deed purporting to convey the land to plaintiffs was apparently dated and acknowledged before a notary on November 23, 1932—nine days after the failure of the Pittsburgh bank in which Huldah was a stockholder. Touching its execution at that time, one of the plaintiffs, Emma Stephenson, testified:

"As to whether I knew of the Diamond Bank in Pennsylvania failing in November, 1932, I don't know whether that was the time I knew it or not. Immediately after that we discussed the failing of the bank . . . Naturally, we had the deed made, to make it safer."

This deed was held off the record, and no one except the mother, the plaintiffs and one brother, knew of its existence until about March 25, 1935, when it was recorded. Ere then the property had been levied upon and sold on execution to satisfy the judgment in *Wilson v. Stephenson*, No. 32,521, supra, and that sale had been confirmed, and the property also had been levied on to satisfy the judgment in favor of the receiver of the Pittsburgh bank. The foregoing are merely a few of the significant features of the evidence

which supported the criticized finding of the trial court. There is a well-established rule of law that conveyances and transfers of property from one member of a family to another are subject to stricter scrutiny as to their *bona fides* than between strangers, where the rights of creditors are, or may be, thwarted thereby. (*Hardcastle v. Hardcastle,* 131 Kan. 319, 291 Pac. 757.) The law books are laden with decisions to this effect. In *Hansen v. First Nat. Bank of Dunlap,* 197 Ia. 1101, 198 N. W. 505, the action was to quiet the title to certain real estate held by plaintiff by a deed from her husband on the same date on which an execution had been issued to subject the property to satisfy a judgment in favor of the defendant bank. Plaintiff prevailed in the court below, but the supreme court reversed the judgment, saying—

"Although the mere relationship between the parties to a contract does not *per se* constitute a badge of fraud, courts sense the obligation to scrutinize closely transactions between relatives when a creditor's interests are involved. Therefore, in dealing with this class of testimony, we necessarily, and perhaps unconsciously, give weight to it in the light of experience and are influenced by the accordance of the evidence offered with facts within the realm of human conduct and experience. The circumstances surrounding the impeached transaction are mute witnesses in the case, and usually are vitally forceful and probatively cogent. We think in terms of their probability, and in the last analysis, the weight to be given the evidence rests, as Greenleaf said, 'upon our faith in human testimony, as sanctioned by experience.' " (p. 1103.)

In a similar case, *Barks v. Kleyne,* 198 Ia. 793, 200 N. W. 439, the court said:

"Although blood relationship is not *per se* a badge of fraud, it strengthens the inferences that arise from circumstances; and whenever this confidential relation exists, the parties are held to a fuller and stricter proof of the consideration and the fairness of the transaction." (p. 799.)

In *Miller v. Correll,* 97 W. Va. 215, 124 S. E. 683, the rule is thus stated:

"A conveyance of land between near relatives is not a badge of fraud when such conveyance is attacked by creditors, though it may require less proof to show fraud than where such relationship does not exist." (Syl. ¶ 2.)

In *Williams v. Ellington,* 233 Ala. 638, 172 So. 903, the suit was a creditor's bill which attacked as fraudulent and void a conveyance of real estate from a husband to his wife and children. In reversing the judgment of the trial court the supreme court said:

"As to the deed, it is to be observed that at the time of its execution the grantor was largely indebted to the bank, and the conveyance is to the wife, son, and daughter. The burden of proof was then shifted to defendants to

establish by strong and convincing evidence that an adequate and valuable consideration was paid for the conveyance. (Citations.)

"True, the relationship is not within itself a badge of fraud, but under all the authorities, supported by reason and common sense, transactions between such relatives are to be jealously watched, and must be subjected to closer scrutiny than would be required of a stranger. (Citations.)" (p. 640.)

Appellants' next complaint pertains to the trial court's finding (No. 6) that the alleged agreement of 1928 between Huldah and her daughters—

"Was a mere colorable paper transaction between Huldah Stephenson and her daughters, to be used by them in case it ever became beneficial to them to cover up and conceal the title and ownership of this particular tract of land. Neither before nor after the 7th of January, 1928, was there any change in the use, occupation, possession, control, beneficial enjoyment or title to said real estate, and the parties did not intend nor contemplate by said agreement that there should be any such change. The daughters had not rendered, nor did they thereafter render any care, attention, love, kindness or affection to their mother beyond that rendered ordinarily by daughters.

"The court further finds that said agreement was not made in good faith and was a mere sham and was contrary to public policy and was and is void."

It would serve no useful purpose to recapitulate the evidence which justified this finding, but a careful reading of the record makes certain incidents of probative force stand out significantly. Possession of the land was not transferred by the agreement. No dominion over the property was exercised by the plaintiffs. There is no convincing evidence that the daughters rendered any service on account of it. The agreement, although notarized, was not recorded. Its existence was secreted even from the other children of Huldah, the sisters and a brother of the plaintiffs.

In *Bank v. Lawrence*, 86 Kan. 171, 119 Pac. 535, the plaintiff attached and sold a half section of Finney county land as the property of its judgment debtor, whose mother claimed to own it by a deed dated prior to the attachment and entry of judgment but not recorded until afterwards. In affirming a judgment denying the mother's motion to set aside the sale on her claim of ownership this court said:

"She could not give the date it was recorded and no satisfactory explanation was given for withholding it from record. . . . [she] only made use of the deed when the land was about to be taken for her son's debt. All this tends very strongly to refute ownership by the grantee and indicates that the real purpose of the deed was to embarrass and defeat the defendant's creditors. The plaintiff was an existing creditor when the deed was made, and without

discussing the evidence further the court holds that the deed was void as to the plaintiff under the statute of frauds and perjuries, which reads as follows:

" 'Every gift, grant or conveyance of lands, tenements, hereditaments, rents, goods or chattels, and every bond, judgment or execution, made or obtained with intent to hinder, delay or defraud creditors of their just and lawful debts or damages, or to defraud or to deceive the person or persons who shall purchase such lands, tenements, hereditaments, rents, goods or chattels, shall be deemed utterly void and of no effect.' (Gen. Stat. 1868, ch. 43, § 2, Gen. Stat. 1909, § 3834.)" (pp. 173, 175.)

See, also, *Sakis v. Sawyer,* 143 Kan. 813, 816-818, 57 P. 2d 52.

In this case it is unnecessary to consider that feature of the purported agreement wherein plaintiffs bound themselves not to marry during their mother's lifetime—further than to remark that the rule announced in *Smith v. Nyburg,* 136 Kan. 572, 16 P. 2d 493, is not an authority to uphold that feature of the contract. (See Restatement, Contracts, § 581.)

The next matter urged on our attention is the significance given by the trial court to the fact that when creditors of the estate of C. N. Stephenson discovered that Huldah, as administratrix, had gotten her hands on some $3,000 belonging to that estate, when her bond was only for $1,500, they consulted the record and found that the land in present controversy stood in her name unencumbered, and on the information there obtained they refrained from asking for an increase in her bond as administratrix. We think that no undue significance was given to this fact. In *Kinsley Bank v. Aderhold,* 131 Kan. 448, 292 Pac. 798, where credit had been extended to a husband because certain land alleged to belong to his wife had actually stood on the record as his property, this court propounded the question:

"Did this situation of affairs create an estoppel against Mrs. Aderhold? The trial court held that it did not—largely constrained thereto, no doubt, by the decision of this court in *McAdow v. Hassard,* 58 Kan. 171, 48 Pac. 846." (p. 453.)

After reviewing earlier decisions, the court answered the question by holding that the circumstances were sufficient to estop the wife from asserting her title against the creditors of her husband. And so here. Even if the *bona fides* of the agreement of 1928 were not questioned, plaintiffs knowingly suffered the title to remain in their mother when they knew that her creditors would naturally look to that quarter section of land to satisfy their claims against herself and to satisfy their claims against her as administratrix because of her appropriation of the moneys of her husband's estate which had

come into her hands as administratrix. Indeed, one of the plaintiffs testified that a realization of that possibility had induced them and their mother to supersede the agreement of 1928 by a deed to the property, which, although withheld from the record for nearly three years, was avowedly intended "to make it safer."

Other findings of the court are briefly criticized by appellants, but they disclose nothing requiring discussion.

The final point urged relates to the second levy on the land in controversy to satisfy the junior judgment of the Pittsburgh bank. Appellants cite the statute which forbids that practice. (G. S. 1935, 60-3460 *et seq.*) The record does not show that this point was fairly presented in the trial court, so it cannot be presented here. (*Clark v. Linley Motor Co.*, 126 Kan. 419, 268 Pac. 860; *State v. Pyle*, 143 Kan. 772, 782-783, 57 P. 2d 93.) Moreover, since we have discovered no material error in the judgment of the trial court holding that these plaintiffs do not own the land in controversy, and since their mother is not here complaining in this appeal of the suggested breach of the statute forbidding more than one sale to satisfy any number of existing judgments or other liens, there is no occasion at present to consider this point.

The judgment is affirmed.