No. 28,133.

W. S. EXLEY, *Appellee,* v. C. L. HARRIS, as Executor of the Last Will and Testament of T. A. Kramer, Deceased, *Appellant,* and C. L. KING and H. F. FERRY, *Appellees* and *Cross Appellants.*

(267 Pac. 970.)

Opinion filed June 9, 1928.

*Bennett R. Wheeler, S. M. Brewster, John L. Hunt,* all of Topeka, and *C. L. Harris,* of El Dorado, for the appellant.

*J. B. McKay,* of El Dorado, for the cross appellants.

*John J. Jones,* of Chanute, *B. R. Leydig* and *K. M. Geddes,* both of El Dorado, for the appellee.

The opinion of the court was delivered by

Dawson, J.: This is another action growing out of the failure of the Butler County State Bank.

Plaintiff's cause of action was founded on the receiving by the bank of a deposit of $5,000 by plaintiff on October 15, 1921, one year, five months and fifteen days before the bank closed its doors for insolvency.

Plaintiff alleged that the bank was insolvent and in failing circumstances at and prior to the time plaintiff's deposit was received, and that the defendants, who were officers or directors of the bank, knew the condition of the bank, or by an examination which it was their duty to make they could have ascertained the fact of the bank's insolvency. At the time of the transaction complained of defendant C. L. King was president and director of the bank; defendant H. F. Ferry was vice president, cashier and director; and the late T. A. Kramer was also a director, and so continued until his death in July, 1922, some eight months prior to the closing of the bank; and C. L. Harris, as executor of Kramer's estate, was made a defendant herein from the inception of this litigation. Other officers and directors of the bank were also made defendants, but they are not concerned in this appeal.

Plaintiff's deposit was evidenced by a certificate which read:

"El Dorado, Kansas, Oct. 15, 1921. No. 3828.

"W. S. Exley has deposited with the Butler County State Bank, of El Dorado, Kansas.

"B. C. St. Bk. $5,000 and 00 cts. Dollars, $5,000,

"Payable to the order of himself on the return of this certificate properly indorsed six months after date, with interest at four per cent per annum; no interest after maturity.

"Not payable until maturity.

"Not subject to check.                    L. D. Hadley, *Cashier.*"

Defendants' demurrers to plaintiff's petition were overruled, and they severally answered urging various defenses, including a specific

traverse of plaintiff's allegation that the bank was insolvent and in failing circumstances on October 15, 1921.

Defendant's demurrers to plaintiff's evidence were overruled; the executor's request for special findings in his favor was denied. The cause was tried at length, and findings of fact and conclusions of law favorable to plaintiff were made by the court, the crucial one being No. 4, which reads:

"The court finds as a fact that on said 15th day of October, 1921, at the time of the making of such deposits in said bank by the plaintiff that said bank was insolvent, and that the said directors, C. L. King, H. F. Ferry, A. B. Ewing, L. D. Hadley and T. A. Kramer, had knowledge of the fact that said bank at said time was insolvent, or could and would have had knowledge of such insolvent condition of said bank at said time by examining into the affairs of said bank, and that said directors above named assented to the reception of said deposit at the time of the making of the same."

Judgment was accordingly entered for plaintiff for $5,000 and interest, less dividends of $1,000 and $500 received by plaintiff from the assets of the bank.

Defendants King, Ferry, and Harris as executor, appeal, urging various errors, chief of which is based on their contention that the evidence did not warrant the finding No. 4 quoted above and the judgment based thereon. Defendants go further, and contend that the evidence demonstrated the fact to be quite the contrary—that under the test of the statute defining insolvency the bank was not insolvent on October 15, 1921, when plaintiff's deposit was received.

The evidence upon which plaintiff relies to uphold the challenged finding of fact was to this effect: As early as 1919 the bank had made excess loans to certain borrowers aggregating $286,997.92. By January, 1920, the total of these excess loans had grown to $453,-996.08. These excess loans progressively increased until the time of the transaction giving rise to this lawsuit, as follows:

| | |
|---|---|
| April, 1920 | $432,799.81 |
| October, 1920 | $541,464.00 |
| January, 1921 | $485,000.00 |
| March, 1921 | $714,000.00 |
| July, 1921 | $762,000.00 |
| October, 1921 | $846,000.00 |

Under objections to its competency, this line of evidence portrayed a continuation of this reckless system of banking after the reception of plaintiff's deposit in October, 1921, until the collapse of the bank on March 30, 1923. Plaintiff's evidence also showed that as early

as 1919 an examiner of the bank commissioner's office began to denounce the condition of affairs in this bank; and the record is replete with criticisms, orders, admonitions and demands by the bank commissioner and his examiners that this vicious system of operating the bank be corrected; that the making of excess loans be stopped; and those loans reduced or charged off. The record shows, too, that the bank commissioner's demands, orders or entreaties had no substantial effect on the willful, reckless banking methods of the managing officers of the Butler County State Bank, with the consequence which was eventually bound to happen—the complete ruination of the bank and the closing of its doors for insolvency in March, 1923. The status of the bank shortly before the reception of plaintiff's deposit was shown in a summarized report of its condition made by a bank examiner on September 14, 1921. Its most material portions read:

"Loans and other assets of doubtful value, and assets carried on books at more than market value.

"There will be at least a 25% loss on the paper listed as questionable, or about $100,000 loss.

"Loans classed as worthless amount to over $7,000.

"Loss on Liberty bonds, over $5,000.

"Unearned interest, over $15,000.

"Accrued interest on O/D's, est. $6,000.

"Loss on life insurance premiums paid for borrowers and carried as assets, together with loss in other real estate, about $7,000.

"This is a total loss in sight of about $140,000.

"They have at least $25,000 hidden value in their building which, added to their surplus of $85,000, would make $110,000.

"To this add the assessment ordered of $50,000 would make $160,000 out of which to take the estimated loss of $140,000, leaving the capital and surplus safely unimpaired."

The bank's capital of $100,000, its surplus of $85,000, and the hidden value of its bank building, $25,000, made a total of $210,000. Deducting the estimated losses of $140,000 from $210,000 a balance of $70,000 is disclosed.

Appellants claim another asset of $16,928.98 which would swell this balance to $86,928.98, but we have been unable to trace and verify this alleged asset in the record.

By this official estimate and summary of the bank's condition shortly prior to the reception of plaintiff's deposit there was a margin of $70,000 in capital and surplus assets over all estimated losses.

Therefore this court is constrained to admit the force of defendants' contention that proof of the reckless course of bank management pursued by its responsible officers, and tolerated—mayhap approvingly sanctioned—by the defendant directors, from 1919 to October 15, 1921, did not prove that the bank was insolvent on that date. The fact that a bank has many excess loans, and permits their aggregate to increase, and that its officers disregard the orders of the bank commissioner to quit making such loans and to reduce those already made, proves willful mismanagement of the bank for which those officers should have been summarily removed (R. S. 9-158), and subjected to criminal prosecution (R. S. 9-137), and the bank's franchise forfeited (R. S. 9-124); but such delinquencies do not prove the bank to be insolvent. If the period were one of inflation, business expansion and general prosperity, it might mean that the bank was conducting a highly profitable though imprudent business and that its financial strength was increasing rapidly. Moreover, excess loans do not necessarily constitute losses to a bank. That would depend on the financial solvency and responsibility of the borrowers. And the fact that a bank is closed for insolvency in March, 1923, and that its excess loans are thereafter shown to be worth only a fraction of their face value is no evidence that the borrowers of those excess loans were not financially solvent in October, 1921. Many a wealthy man whose obligations are gilt-edged to-day may meet with financial and business reverses which will sweep away his fortune and render his obligations of no value a year hence.

The statute under which liability is sought to be fastened on defendants, in part, reads:

"A bank shall be deemed to be insolvent—first, when the actual cash market value of its assets is insufficient to pay its liabilities—second, when it is unable to meet the demands of its creditors in the usual and customary manner; third, when it shall fail to make good its reserve as required by law." (R. S. 9-133.)

It is not suggested that the Butler County State Bank was insolvent under either the second or third of these statutory tests. The bank continued to function for nearly a year and a half after plaintiff's deposit was received; and we have seen that by the best evidence available—the report of the bank examiner—the actual cash market value of its assets was more than sufficient to meet its liabilities after charging off the maximum estimate of its losses on

September 14, 1921; and no substantial change was shown between that date and October 15, 1921, when the transaction occurred which gave rise to this lawsuit.

It is settled law that for the purpose of determining whether a bank is insolvent its capital and surplus are to be counted as assets. In *State v. Myers*, 54 Kan. 206, 38 Pac. 296, it was said:

"The capital and surplus of a bank are its resources which may be used to pay its depositors and other creditors, when there have been losses by loans or otherwise. If a bank by using its capital or surplus, or both, can pay promptly its deposits and other debts, as they become due in the ordinary course of business, it is not insolvent. Upon the books and in the official statements of a bank, capital stock and the surplus fund are denominated as liabilities, but they are resources of the bank with which to transact its business. . . . If a bank is able to pay promptly every depositor and every other creditor in the ordinary course of business, the bank, under section 16 of said chapter 43, [Laws 1891, ch. 43, § 16; R. S. 9-119] is solvent, whether there is any surplus or capital to be distributed afterwards to the stockholders or not." (p. 217.)

"Solvency is a matter of statutory definition, and includes actual cash market value of assets with which to discharge liabilities." (*State v. Powell*, 120 Kan. 772, 788, 245 Pac. 128.)

In 7 C. J. 727 the rule is thus stated:

"A bank is solvent when it has enough assets to pay, within a reasonable time, all of its liabilities through its own agencies, and is insolvent when unable to meet its liabilities as they become due in the ordinary course of business, or, in shorter terms, when it cannot pay its deposits on demand in accordance with its promise. In determining this question a bank's capital and surplus are considered its resources."

The report of the bank examiner also refers to an assessment of 50 per cent which was levied on the stockholders to restore the impaired capital of the bank caused by the estimated losses of $140,000 It was considered that this 50 per cent assessment, which would produce $50,000, would completely rehabilitate the bank's capital and surplus. We have not been able to trace and verify these figures in the record, but by adding the $50,000 to be raised by an assessment to the $70,000 net balance shown above, the capital would be restored to its original $100,000 with $20,000 surplus, at least. The statute, R. S. 9-145, authorizes such a course—not when a bank is insolvent, but whenever its capital has been somewhat impaired, where the bank's crippled condition is not so bad as to justify its closing for insolvency. It is perfectly clear that in September, 1921, when the bank examiner made that report, and the 50 per cent as-

sessment was ordered, the condition of the bank was not one of insolvency, nor was it so considered by the banking department. While the attitude of that department would not be controlling, its persuasive and evidential significance cannot be overlooked—unless its good faith was challenged, which was not done in this case.

It therefore follows that defendants' main contention is correct. The evidence not only fails to support the trial court's finding No. 4, but an analysis of the bank examiner's report affirmatively shows the contrary to have been the condition of the bank at the nearest date on which any specific evidence was available, and at a time sufficiently close to the date of plaintiff's deposit to be of probative value.

This conclusion renders it unnecessary to consider other matters urged on our attention. Since the judgment of the trial court was necessarily predicated on finding of fact No. 4, that judgment must be reversed and the cause remanded, with instructions to enter judgment for defendants.

It is so ordered.

HARVEY J. (dissenting): The estimated loss of $140,000 made by the bank examiner on the date of September 17, 1921, is not the maximum or even the actual loss as of that date; but is an estimate of the minimum loss. But in addition to this, there is the matter of the excess loans. Now, I realize as an abstract proposition, that an excess loan is not necessarily an unsound loan. But these particular excess loans—most of them, not quite all—were unsound. It was thoroughly established by the evidence in this case that they were unsound when the bank closed in March, 1923. No one now contends to the contrary. Generally speaking, it was these very excess loans, unsound as they were, which caused the bank to fail. But it is argued that evidence showing these loans were unsound in March, 1923, does not establish that they were unsound when the deposit in question in this case was made in October, 1921. If this were all the evidence on the question there would be force to the argument. But there was other evidence that even prior to October, 1921, and continuously until the bank was forced to close, the soundness of these various excess loans was decidedly questionable; that the bank commissioner had repeatedly directed the officers of the bank to collect these loans or retire

them; but although their conduct was in violation of penal statutes of the state, the bank officials continued to renew, and even to increase them. Now, can any reason be suggested why the bank officials would disregard the directions of the bank commissioner and violate the penal statutes of the state if it had been possible for them to collect these loans? .It develops they were not only unable to collect them, but unable even adequately to secure them. To me only one reasonable conclusion could be drawn from this evidence, and that is that the excess loans in question were, in fact, as unsound in October, 1921, as they were in March, 1923. It should be noted that defendants did not testify nor offer evidence of any character in this case. Obviously they were in possession of no evidence which, if introduced, would tend to contradict the conclusion which the trier of facts would naturally reach from the evidence offered by plaintiff, namely, that the excess loans which wrecked this bank were unsound in October, 1921, or even to offer evidence that would mitigate or lessen the force of the evidence from which the trial court of necessity reached such conclusion. In my judgment, we are not justified in saying that the evidence is insufficient to support finding No. 4 made by the trial court. The judgment of the court below should be affirmed.

HOPKINS, J., concurs in this dissent.