No. 29,131.

THE STATE OF KANSAS, *Appellee*, v. J. G. MILLER, *Appellant*.

(289 Pac. 483.)

Opinion filed July 5, 1930.

*A. M. Keene, John L. Connolly,* both of Fort Scott, and *John A. Hall,* of Pleasanton, for the appellant.

*William A. Smith,* attorney-general, *Fred W. Bayless,* county attorney, *Ernest E. Blincoe* and *Harry Warren,* both of Fort Scott, for the appellee.

The opinion of the court was delivered by

HARVEY, J.: J. G. Miller has appealed from a judgment of conviction on an information in which he was charged, in twenty-five counts, with violations of the banking law. The first twenty-four counts of the information charged that the appellant (and another), being director and president of the Midwest State Bank of Fort Scott, on a date named, "did then and there willfully, unlawfully, feloniously and knowingly permit and connive at the receiving and accepting on deposit in said bank" of a specified deposit; and that the bank was then insolvent, which insolvency was known to defendant. The first nine counts in the information charged the deposits with having been made on February 23, 1927. Counts 10 to 15, both inclusive, charged the dates of the deposits as February 21, 1927, and counts 16 to 24, both inclusive, charged the deposits as having been made on various dates from December 21, 1926, to February 19, 1927. The twenty-fifth count charged the making of certain false entries in the books of the bank and a false report to the bank commissioner.

The Midwest State Bank of Fort Scott was organized about 1919, and continued to do a banking business until February 24, 1927, when it was closed by order of its board of directors, taken charge of by the bank commissioner, and a receiver, later appointed, wound up its affairs. Most of the stock of the bank was owned by J. G. Miller and his relatives. Some of the stock was owned by J. W. Montee and some other active officers of the bank. J. G. Miller lived at Mulberry, where he was interested in the Miners State Bank of that place. He was also interested in five or six other banks located in various towns in that part of the state, also in several business corporations and in the operation of farm and

mining properties. He was a director and president of the Midwest State Bank all of the time of its existence. He was an officer of the other banks and corporations in which he was interested, and president of some of them. J. W. Montee was a stockholder of the bank from its organization, was one of the active officers in charge of its management, and from January, 1926, was the active vice president. A. C. Bean was with the bank from October, 1922, until February 15, 1927, first as assistant cashier, and from January, 1926, as cashier. Edith Long was assistant cashier and bookkeeper.

Appellant first complains that the court refused to grant a change of venue. We have carefully examined the record on this point, considered all counsel have said relating to it, and are unable to find error in the ruling. It is not necessary to set out in detail the showing made. Since the change made in our statute following the ruling of this court in *Smith v. State,* 1 Kan. 365, it has been uniformly held that whether venue should be changed because of local prejudice is a question which rests largely in the discretion of the trial court; that the court tries this question on the evidence presented to it, and that its judgment thereon, if sustained by competent evidence and is not so erroneous that it could be said to be an abuse of the court's discretion, will not be disturbed in this court. (*State v. Horne,* 9 Kan. 119; *State v. Bohan,* 15 Kan. 407; *State v. Rhea,* 25 Kan. 576; *State v. Furbeck,* 29 Kan. 532; *State v. Knadler,* 40 Kan. 359, 19 Pac. 923; *State v. Daugherty,* 63 Kan. 473, 65 Pac. 695; *State v. Parmenter,* 70 Kan. 513, 79 Pac. 123; *State v. Bassnett,* 80 Kan. 392, 102 Pac. 461; *State v. Tawney,* 83 Kan. 603, 112 Pac. 161; *State v. Mullins,* 95 Kan. 280, 288, 147 Pac. 828; *State v. Kagi,* 105 Kan. 536, 185 Pac. 62; *State v. Brown,* 114 Kan. 452, 219 Pac. 279; *State v. Waldron,* 118 Kan. 641, 236 Pac. 855; *State v. Welch,* 121 Kan. 369, 372, 247 Pac. 1053; *State v. Robinson,* 125 Kan. 365, 366, 263 Pac. 1081; *State v. Harris,* 126 Kan. 710, 271 Pac. 316.) While it is true that the record in this case presents some features which differ from those presented in any of the cases cited, yet, applying the principles determined in those cases to the record before us, it must be held that there was no error in the ruling. In this case defendant was not arrested until more than a year after the bank had failed, and we note that there was no particular difficulty in getting a jury in this case. The jury was selected in less than a day, and there is no complaint even now that any juror was permitted to serve whose examination disclosed any feeling or prejudice against the defendant.

Appellant complains of the refusal of the court to grant further continuance because of the illness of one of defendant's counsel at the trial. The trial of the case began December 12, 1928. The state completed the introduction of evidence at noon December 21, and the court recessed until the next day, when defendant's opening statement was made and evidence in his behalf was introduced. Defendant was represented at the trial by three attorneys—A. M. Keene and John L. Connolly, of Fort Scott, and John A. Hall, of Pleasanton. On December 26, Messrs. Connolly and Hall asked for a postponement of the trial because of the illness of Mr. Keene, and a recess was taken until the next day, when the application was renewed and the trial was postponed until December 31. On the morning of that day the application was renewed, but further continuance was denied, and defendant proceeded with the introduction of evidence and completed the same on the next day. While it is true that Mr. Keene is a capable lawyer and was perhaps more familiar with the details of the case than other attorneys by reason of having been the personal attorney of defendant for about four years, it is also true that the other attorneys representing defendant are capable lawyers, and aside from their previous study of the case they had been given about five days for study and preparation after the illness of Mr. Keene. There is nothing in the record to indicate that the interest of defendant was neglected or his rights jeopardized. The question of whether a further continuance in the case should have been granted was one largely within the sound discretion of the trial court (*State v. Sullivan*, 43 Kan. 563, 23 Pac. 645), and the record here is far short of showing an abuse of that discretion.

Taking up now the first twenty-four counts of the information. (The twenty-fifth count, being a charge of a different nature, will be treated separately later.) The state showed the deposits by the persons, in the amounts and on the dates as charged, and no complaint is made about that. It is not contended that defendant personally received any of the deposits or was present at the bank when they were received, or that he had actual knowledge of the receipt of the respective deposits at the time they were received. Any questions which might arise relating to those matters are not in the case. The questions argued are: (1) whether the bank was insolvent on the dates of the deposits; and (2) if so, did the defendant know that fact; and (3) if the bank was insolvent and defendant knew it, did he permit and connive at the reception of such deposits.

As to the insolvency of the bank: The state's contention was that the bank was insolvent when tested by that portion of our statute (R. S. 9-133) which provides that a bank shall be deemed insolvent "when the actual cash market value of its assets is insufficient to pay its liabilities." There was no contention or showing that there were any forged or false notes in the bank, or that there had been any embezzlement of bank assets or bonds or other securities of its patrons, or that the bank did not have the property which its books showed it to have. The contention was simply that the "actual cash market value" of its assets, as shown by its books, was insufficient to pay its liabilities.

Most of this loss in the value of bank assets was in the notes held by the bank. The fundamental fault of the officials of the bank which resulted in its failure appears to have been in their failure, in many instances, to get adequate security for money loaned. As early as January, 1926, the bank was having financial difficulties. Its directors furnished the bank commissioner a certificate, under oath, that they had examined all of the bills receivable of the face value of $208,029.36, and declared that, to the best of their knowledge and belief, all of them were worth face value, except as listed in schedules. Those listed in schedule A as worthless aggregated a little more than $15,000; schedule B, of questionable value, aggregating $10,000; and schedule C, slow paper, which it was believed would eventually be paid in full, aggregating $37,700. The examination of the bank at that time disclosed a deficit of about $750 in the earnings of the bank, and also disclosed excess loans, most of which were to the officers of the bank. As a result of this examination the bank commissioner made a number of requirements, among others to "collect an assessment sufficient to take care of present losses in your bank, which, in the examiner's opinion, should not be less than 100 per cent." The bank was criticized for being "entirely too lax in taking security," and was admonished to secure the paper better in the future; also that the bank was overloaned and that the officers of the bank should reduce their indebtedness. Criticisms made by the bank commissioner were in part complied with by the bank officials. An assessment of forty per cent on the bank stock was made, and the defendant J. G. Miller and other members of his family who were stockholders paid that assessment, aggregating $8,000, into the bank. J. W. Montee sold ten shares of his stock to A. C. Bean, taking his note therefor for $1,500, and five shares of his stock to R. E. Mitchell, taking his note for $750. These

notes were placed in the bank as the forty per cent of his assessment. A stockholders' account was opened, and the amount paid in assessments, aggregating $10,250, was credited to the stockholders' account. We shall need to refer to this again in discussing count 25 of the information. When the bank was closed, February 24, 1927, it showed loans and discounts amounting to $143,099.49. In response to an order of the court made on application of defendant, the state had filed a bill of particulars, in which it set out a list of notes held by the bank, as a part of its assets, of the face value of approximately $83,000, which the state contended were of no value. This list included a group of notes spoken of as the "Montee notes," aggregating $10,825, and a list of notes spoken of as the "Miller notes," aggregating $15,700. On the trial the state produced evidence tending to show that all of the notes listed in its bill of particulars were of no value except the "Miller notes," which were worth about twenty-five cents on the dollar. The state produced other evidence by witnesses familiar with certain groups of notes and their makers, tending to show that notes held by the bank, of the aggregate face value of about $122,000, were reasonably worth but little more than $6,000. In addition to this the state produced evidence that "other real estate" carried on the books of the bank at a value of $14,574 consisted of equities in farm land of a cash market value of not to exceed $600. Defendant offered no evidence to controvert these values except as to the "Montee notes," the "Miller notes" and "other real estate," but as to these the defendant's evidence tended to show that they were worth full value. Assuming the jury took that view, the evidence was uncontrovertible that notes of the aggregate face value of more than $56,000, carried on the books of the bank as assets worth their face, had in fact no actual cash market value. The capital stock of the bank was $25,000; its surplus, $2,500; undivided profits, $150.30. If to that be added the stockholders' account of $8,000, which will be mentioned later, the total is but $35,650.30. The loss in actual cash market value of assets was, therefore, greater by more than $21,000 than the total interests of the stockholders in the bank. It is clear, therefore, that from the evidence which was not controverted the bank was insolvent at the time of its close, and there was evidence that substantially the same condition had existed for several months.

With respect to the "Montee notes" and the "Miller notes," appellant complains that the court unduly restricted evidence as to their value. The only evidence permitted by the court was the

opinion of witnesses whose examination disclosed a familiarity with the makers of the notes and the market value of commercial paper. Such witnesses for the state testified that the "Montee notes" were of no value and that the "Miller notes" were worth about twenty-five cents on the dollar. Witnesses on behalf of the defendant testified the notes were worth their face. In addition to that the defendant offered evidence that the makers of the "Montee notes" owned nonexempt real property in excess of the amount of the notes. This evidence was excluded on the theory that to go into that method of proving value would unduly prolong the trial and result in the trial of numerous side issues. The ruling was erroneous. When the value of specific assets is in question any competent evidence on that question should be received. With respect to the "Miller notes" the defendant was permitted to testify as to the property owned by the makers of the notes and its value, but the testimony of other witnesses familiar with those facts relating thereto was excluded. This likewise was erroneous. The state cites the case of State v. Powell, 120 Kan. 772, 245 Pac. 128, in support of the ruling of the trial court that opinion evidence as to value was the only kind that should be received. The case is not an authority for that holding. The case discusses opinion evidence on the question of insolvency of a bank, but on the question of how to prove the value of assets it was said in the opinion:

"The normal way to prove the actual cash market value of the assets of the bank was to take *seriatim* the classes of its resources which appear in condensed bank statements, loans and discounts, overdrafts, real estate, furniture and fixtures, other real estate, bonds with the state treasurer, bonds and warrants, cash and sight exchange, and other resources, and prove the value of all except those classes whose value is established *prima facie* by description." (p. 787.)

In that case the bank had been rendered insolvent because of two things—a shortage of nearly half a million dollars in its statement of amounts due from other banks and a shortage of more than a million and a half dollars in bonds which it should have had in its vault. The prosecution in that case might have conceded that all of the other assets of the bank were worth the sum shown by its books, for this loss of more than two million dollars wrecked the bank. There is nothing in the opinion in that case in variance with the rule here stated, namely, that in proving the value of assets any competent evidence pertaining thereto should be received. As bearing on this question see Exley v. Harris, 126 Kan. 302, 267 Pac.

970; *Akin v. Hull*, 222 Mo. App. 1022; *Leach v. Beazley*, 201 Ia. 337; *Andrew v. Citizens' St. Bk. of Goldfield*, 207 Ia. 386; *United States Fidelity & Guaranty Co. v. Porter*, 3 F. (2d) 57; *Federal Reserve Bank v. Idaho Grimm Alfalfa Seed G. Ass'n*, 8 F. (2d) 922. But the error of the court in restricting the evidence as to the value of the "Montee notes" and of the "Miller notes" becomes immaterial in this case, for the reason that, as previously stated, there was uncontradicted evidence that notes of the aggregate face value of more than $56,000, carried as assets of the bank, were of no actual cash market value, and this exceeds the amount of capital stock, surplus, undivided profits and stockholders' account of the bank by more than $21,000, which left the assets insufficient, by at least that amount, to pay its liabilities to depositors and other creditors. This established the insolvency of the bank beyond question. As tending to show insolvency there was evidence of other facts and circumstances which we deem it unnecessary to set out in detail.

As to the solvency of the bank the court instructed the jury (after quoting R. S. 9-133) as follows:

"One of the conditions laid down in the foregoing statute which renders a bank insolvent is, 'When the actual cash market value of its assets is insufficient to pay its liabilities.' In this connection you are instructed that the term 'actual cash market value' has reference to a market value that is real and existing, as opposed to nominal, pretended or speculative value, and means that price for which the assets in question can be sold for cash by one who wants to sell such assets to one who wants to buy such assets for cash, at the time and place and under the conditions and circumstances then and there existing. And you are further instructed that in applying this test to the Midwest State Bank and determining whether said bank was solvent or insolvent at the time the deposits in question are alleged in the information to have been received, the capital, surplus and undivided profits of said bank, if any, are not to be included and counted as liabilities of the bank in balancing its assets against its liabilities; . . ."

Appellant complains of this instruction and argues that it makes too strict a rule as to the solvency of banks and says that in time of financial depression no bank, or at best but few banks, could find a cash market for its assets at a value sufficient to pay its liabilities. The instruction is no more strict in this regard than is the statute. The real question, therefore, is, Does the statute place on the banks a test of solvency which is too strict? This is a question which should be addressed to the legislature instead of to the courts, for it is uniformly held that the legislature has authority to lay down rules for determining the solvency of banks which may be organized

under legislative authority. Touching this point it was said in *Dover v. State*, 165 Ark. 496:

"All of the authorities agree that, in statutes of this sort, the legislature might have the power to define what would constitute insolvency under the banking law. The business of a banker is affected by a public interest and therefore subject to public regulation. As a part of the regulatory act the legislature would have the undoubted power to define what would constitute insolvency within the meaning of the act. The definition by statute would inure not only to the benefit of the general public doing business with banks, but also to the banks themselves." (p. 502.)

In a case such as this we are not dealing with insolvency in its popular sense, but in its legal sense as defined by statute. (*Com., ex rel., v. Tradesmen's Tr. Co.*, 237 Pa. St. 316.)

In *State v. First State Bank*, 52 N. D. 231, it was said:

"It is well settled that the legislature is vested with constitutional authority to regulate the business of banking; and may even prohibit the business from being carried on at all, except under such conditions as it may prescribe. . . . And the legislature has power, by general law, to alter or even withdraw franchises granted to banking corporations. . . . Hence the legislature clearly had power to say when and under what conditions banking corporations should be deemed insolvent and subject to liquidation; and also had power to prescribe any mode or manner for the liquidation of such insolvent banking corporations, not expressly forbidden by the constitution." (pp. 245, 246.)

The insolvency of a bank while a going concern is a question of fact (*Andrew v. Citizens' St. Bk. of Goldfield*, 207 Ia. 386), and must therefore be determined by the evidence produced at the trial when measured by the statute defining insolvency.

Passing now to defendant's knowledge of the insolvency of the bank. He was president of the bank from its organization and was required by statute (R. S. 9-109), in so far as the duty devolved upon him, diligently and honestly to administer the affairs of the bank. He and his near relatives owned eighty per cent of the stock of the bank. While he had large and varied financial interests elsewhere, the evidence tends to show that he was in fact the supervising and dominating head of the bank. He visited the bank about once a week, examined the daily statement, talked with the officers there about the various questions which arose respecting its business, and frequently examined the note case, discussing the various notes and their makers and giving directions with respect to them. When not at the bank he was in touch with it almost daily by telephone. Before officers at the bank made loans of consequence he was

called and his opinion sought and followed. As much as a year before the bank closed he knew that the earnings of the bank were insufficient to pay its expenses; that the bank commissioner had made a number of specific requirements designed to put the bank in sound financial condition, only a few of which had been complied with; that the bank commissioner then thought all the capital of the bank had been lost and required a stock assessment of "at least 100 per cent," and that only forty per cent on eighty per cent of the stock had been paid in; and that the bank had been asked to reduce his own notes and notes of business organizations in which he was interested, and that this had not been done, although he signed a statement listing these notes as "slow." Shortly before the bank closed he renewed all these notes, some of which were not due, and without paying interest on them. At the time the bank closed it was carrying as cash items his checks amounting to $6,200, some of which had been so carried several months. His testimony as to why he had the bank carry these checks in that way was controverted and was likely discounted by the jury. Defendant was a director and president of the Farm and Home Savings and Loan Association, which had offices in the building with the bank. It had an account of about $23,000 in the bank. On February 17, 1927, it purchased notes from the bank, for which it gave its check for $18,661.61. Some of these notes had been sent to the Midwest State Bank from other banks in which defendant was interested. The association did this, in part at least, for the purpose of getting its money out of the bank. It drew other checks, so that when the bank closed February 24, 1927, its account had been reduced to about $600. Other facts tending to show defendant's knowledge of the true financial condition of the bank might be detailed. We deem it sufficient to say the jury was justified in concluding that defendant had such knowledge.

Passing now to the question of whether the evidence disclosed that appellant permitted and connived at the receiving of deposits, there is no trouble about the proof of that as to all deposits charged to have been made prior to February 23, 1927, for defendant knew that the bank was open for business on those dates, receiving and accepting deposits, and by so doing was inviting deposits to be made. (*Raynor v. Scandinavian-Am. Bank,* 122 Wash. 150; *Steele v. Commissioner of Banks,* 240 Mass. 394; and *Dover v. State,* supra.) As to the deposits charged to have been made on February 23, 1927

(counts 1 to 9 of the information), a different question is presented. Defendant offered to show that on February 22 he and his attorney were in conference with representatives of the banking department at Pittsburg with respect to the continued operation of all of the banks in which he was then interested; that the representatives of the banking department were contending that the banks were insolvent and should be closed, while defendant was contending that they were not and that he and the other stockholders of the banks could raise the money necessary to comply with all of the requirements of the banking department with respect to such banks; that as a result of that conference it was concluded the banks should continue to do business on the 23d; but in view of the fact that the representatives of the banking department were contending that the banks were insolvent, defendant insisted that if the banks did business on the 23d any deposits offered should not be received on general deposit, but should be kept separate from the other assets of the banks and handled as special funds; that defendant stayed in Pittsburg on the 23d, and that plan was carried out at the bank in which he was interested there; and that he sent word, through his attorney, to those in active charge of the bank in Fort Scott to follow the same plan, and had every reason to believe that his instructions would be carried out. Evidence was also offered to the effect that all deposits offered at the Midwest State Bank on February 23 were kept separate as special funds until about the time for the closing of the bank in the evening, when the assistant cashier, without the knowledge or consent of defendant, entered the receipts of that day as deposits. The explanation of the assistant cashier for having done so was that she was informed by Mr. Bean that one of the other banks at Fort Scott was taking over the Midwest State Bank at the close of business that day, and she believed those representations, none of which was known to defendant. The trial court excluded all this evidence. It was properly offered at the hearing of the motion for a new trial. Appellant complains of that ruling. It was erroneous. It must be remembered that the charge in this case is that defendant permitted and connived at the receipt of deposits when the bank was insolvent and he knew it to be insolvent. Certainly if he gave positive directions for the handling of funds offered for deposit in such a way that they would be special funds and not deposits, and if he had reason to believe

these instructions would be carried out, he could not be held guilty of the charge made against him, even though his instructions were violated. The error in this respect requires the reversal for a new trial of the conviction of these counts.

The twenty-fifth count charged that on or about December 27, 1926, the defendant, being the president and a director of the Midwest State Bank, willfully subscribed to and made a certain false report, statement and entries in writing in the books of the bank, and a false report to the bank commissioner, and caused the same to be published, with the intention to deceive the bank commissioner and the public, in that at the close of business on that day the resources of the bank were $262,854.44, whereas the resources were much less than that amount; that the loans and discounts were $162,-473.36, whereas they were much less than that amount; that the furniture and fixtures were valued at $12,020.94, whereas their value was a great deal less; that the cash items were $489.40, whereas they were a great deal more, or should have been if properly entered; that the clearing-house items were $8,331.86, whereas they were much less; that the liabilities of the bank were $262,854.44, whereas the liabilities were a great deal more; that the profit-and-loss account showed a profit of $69.06, whereas it should have shown a loss of $1,930.94; and that upon receipt of the official call for a statement the books of the banks were falsely changed by decreasing the individual deposits $2,000 and increasing the profit-and-loss item that much, in order to prevent the report from correctly showing a loss. It is not contended that this count did not state an offense under the statute. (See R. S. 9-118; *State v. Creighton*, 118 Kan. 418, 235 Pac. 1064.) With respect to changing the books the evidence disclosed that when the assessment required by the bank commissioner was paid in on the stock ($8,000 in cash and $2,250 in notes), instead of crediting that to surplus or the profit-and-loss account as might have been done, a new stockholders' account was opened, under which it was credited as a deposit. When the bank commissioner sent a notice to the bank for the report of the condition of the bank at the close of business December 27, the notice reached the bank on December 30. If the report had been made as shown by the books of the bank it would have shown a loss of $1,930.94. To prevent that showing the bookkeeper transferred $2,000 from the stockholders' account to the profit-and-loss account, making the latter account show a profit of $69.06, and changed the records of

the bank for each day from December 30 back to December 27. The evidence as to that is clear, also the evidence that the report was false in some of the other respects charged. Appellant's contention is that there is no evidence that he knew the report was false in any respect, and contends that the report was made up at the bank, sworn to by the vice president, and mailed to him at Mulberry, where it was signed, and that he had no knowledge of any manipulation of the books or false statements in the report. The defendant signed this statement and attested it as correct, and it was his duty to know the condition of the bank. In view of the evidence concerning his supervision of the bank and knowledge of its condition, the jury cannot be criticized for concluding that he perhaps directed the making of the report, and certainly that he knew its contents.

Appellant contends that a new trial should have been granted because of the misconduct of counsel for the state, particularly because of remarks made in the closing argument to the jury. The record on this point is not very satisfactory. A day or two after the verdict of guilty had been received and before the motion for a new trial was passed upon, the courthouse burned. All the papers and exhibits used in the trial of the case and the stenographer's notes, which had not been transcribed, were burned. Quite a little difficulty has been experienced in perfecting a record for appeal, but no serious complaint is made of the record as finally completed, except with respect to the closing argument of counsel for the state. As to this, counsel for defendant, from their recollection and from notes made during the argument, made up a statement of the argument, particularly the parts objected to. Counsel for the state also made up a similar statement. This did not contain all of the objectionable remarks contained in the statement made by counsel for defendant. In settling the record the trial court did not follow either statement in its entirety, but made up one which eliminated most of the seriously objectionable remarks contained in the statement made up by defendant's counsel and some of those contained in the statement made up by counsel for the state. At first thought it is difficult to see why the trial court should cut out objectional remarks which counsel for the state conceded he made, but the trial court heard the argument, possibly made notes of it, and may have concluded that counsel for the state did not make all of the objectionable remarks which he was willing, for the purpose of the record, to

concede he had made. The settling of the record under these circumstances was for the trial court, and if it was settled inaccurately, as is contended by appellant, there is not much this court can do about it. We must determine cases on the record. In determining this matter upon the record before us the remarks of counsel for the prosecution are not so objectionable as to require the granting of a new trial.

Other details are discussed in the briefs. It would prolong this opinion unduly to state them at length. We have examined each of them and find no prejudicial error in them.

As to counts 1 to 9, inclusive, the judgment of the court below will be reversed, with directions to grant a new trial. As to counts 10 to 25, inclusive of both, the judgment of the court below is affirmed.

HUTCHISON, J. (dissenting): I cannot concur in the conclusion reached with reference to the highly objectionable language admitted by the state to have been used in the closing argument to the jury. There can be very little question but that the use of such language would entitle the defendant to a new trial, and the defendant in my judgment should not be deprived of his rights simply because the trial judge, in the absence of the actual record, did not recollect the unfair and improper language, which the state admitted as having been used in the closing argument to the jury.