No. 30,946

THE STATE OF KANSAS, *Appellee,* v. FRED BIGLER, *Appellant.*

(23 P. 2d 598.)

Opinion filed July 8, 1933.

*Jerry E. Driscoll,* of Russell, *Carl S. Byers,* of Salina, and *Guy L. Hursh,* of Topeka, for the appellant.

*Bryan J. Hoffman,* county attorney, for the appellee; *Z. C. Millikin,* of Salina, of counsel.

The opinion of the court was delivered by

DAWSON, J.: Fred Bigler was convicted of murder in the second degree for his participation in the crime of robbery which culminated in the violent death of John Baxter, who lived alone on a farm in the eastern part of Saline county.

Bigler had been reared on a neighboring farm, but in recent years he followed the profession of wrestling. He, too, resided alone on a farm belonging to his father, about a mile and a half from Baxter's place. Other wrestlers frequented Bigler's residence. One of these, Aubrey Ogden, made his home with Bigler part of the winter of 1931-1932. Another wrestler, Eldon Sullivan, also came to Bigler's place frequently. Another young man, James Britt, who resided with his mother on a neighboring farm, was associated with this trio and occasionally drove them to wrestling matches in his automobile.

The most significant facts constituting the state's case against Bigler were these:

Bigler had repeatedly remarked in the presence of witnesses that it would be a "soft thing" to rob Baxter, because he lived alone and kept money in his house. About two weeks prior to Baxter's death, which occurred on Sunday night, March 6, 1932, Bigler and Ogden called on Baxter, ostensibly to sell him a "tear" gun to protect himself against robbers. Ogden and Sullivan spent the night preceding the tragedy at Bigler's. On the following forenoon (Sunday) Ogden and Sullivan did some practice shooting with revolvers and drove past Baxter's place on a pretended rabbit hunt. They had some car trouble and telephoned Britt to come to their assistance. These three returned to Bigler's place in the late afternoon. Britt overheard Bigler or Ogden say they had some work to do that night. He asked what kind of work, and Sullivan said, "A holdup." Britt said they could count him out, whereupon Bigler, Ogden and Sullivan started to "razz" him, called him "yellow" and belittled his courage. Britt started for home to do his chores, and Ogden and Sullivan went along, and about 9 o'clock these three returned to Bigler's. Shortly afterwards one of them said, "Let's go," and all four got into Britt's car. Bigler gave the order, "Go north." Thence they went west and turned south to a point near Baxter's home. Bigler said, "Stop," and he, Ogden and Sullivan got out of the car. Bigler then told Britt to drive south to a road corner and return, saying by that time the trio would be ready to go. Britt did as directed, and about the time he returned he heard shots and saw a blaze in the Baxter kitchen. Soon Bigler and Ogden came running to the car, and one of them said, "Let's go." Britt said, "My God, where is Sullivan?" One of them responded that Sullivan and Baxter had shot each other. Baxter was an adept in the use of firearms. He

kept a rifle and shotgun within easy access, and it developed that Sullivan had received a charge in the chest from a shotgun.

The evidence of what immediately followed the shooting of Sullivan and Baxter is partly circumstantial and partly dependent on the testimony of Ogden. But it was inferable that Bigler and Ogden piled the bodies of the dead robber and his victim on a bed, drenched them with oil from a kerosene lamp, and set the premises on fire. Britt drove Bigler to his home and then took Ogden to Salina pursuant to a prearranged plan to provide an alibi for Ogden and Sullivan which slightly miscarried because of Sullivan's death.

It did not take long for the officers of the law to solve the probable cause of Baxter's death; and within two days Bigler, Ogden and Britt were arrested for the crime. Ogden pleaded guilty, but insisted that Sullivan was primarily responsible and that Bigler had nothing whatever to do with the robbery or with its tragic consequences. Ogden also declared that it was himself and Britt who piled the bodies of Sullivan and Baxter on the bed and set fire to the premises. Britt turned state's evidence and supplied most of the incriminating facts which the jury chose to believe, including many details it seems needless to repeat.

The jury returned a verdict of guilty of murder in the second degree against Bigler, and the latter appeals.

1. (a) The first error assigned relates to the denial of defendant's application for a change of venue. On his behalf it was shown that the crime was a matter of some notoriety and the subject of much newspaper publicity in Saline county. The state, however, by affidavits of numerous citizens living in various parts of the county, made a strong showing that there was no known hostility to defendant, that the case was not much discussed, and that no expressions were heard indicating that defendant could not have a fair trial in Saline county, and affiants averred their belief that he could have a fair trial. The application was addressed to the trial court's discretion, and nothing in the record suggests any probability of its abuse. (*State v. Mullins*, 95 Kan. 280, 147 Pac. 828, syl. ¶ 4; *State v. Miller*, 131 Kan. 36, 289 Pac. 483.)

(b) The next error is based on the overruling of defendant's motion to require the state to elect on which of the four counts of homicide and the fifth count of arson charged in the information it would rely for conviction. In the *first* it was charged with ap-

16

propriate recitals that Bigler fired the murderous shot which killed Baxter; the *second* charged that it was fired by Ogden; the *third* by Sullivan, and the *fourth* by Bigler, Ogden and Sullivan, "or some, or all of them, the identical person or persons of them, so holding said pistol or pistols being unknown," etc. The state had no disinterested eyewitnesses to the homicide. Under the law all who participated in the felonious attempt to rob Baxter and which culminated in his death were alike guilty of murder in the first degree, no matter which of them actually fired the fatal shot. (R. S. 21-401; *State v. Roselli,* 109 Kan. 33, 198 Pac. 195.) It was therefore mere prudence and good pleading under our criminal code for the prosecuting attorney to incorporate four counts in the information to meet the exigencies of the evidence, it being made clear to defendant and likewise to the jury that only one offense of homicide was intended to be charged against him. In *State v. Ricksecker,* 73 Kan. 495, 85 Pac. 547, it was held:

"Where an information contains several counts, intended to charge the same substantial offense in different ways, and their allegations are not inconsistent, it is ordinarily not error for the trial court to refuse to require the state to elect upon which one it will rely for a conviction." (Syl. ¶ 1. See, also, *State v. Sanders,* 127 Kan. 481, 274 Pac. 223, syl. ¶ 5.)

2. Error is based on the overruling of defendant's motion to strike out certain evidence touching the firearms which, according to the theory of the state, figured in the crime—Bigler's two guns, a .38 revolver, and a 4-barrel .22 gun, and Ogden's .25 automatic. Empty shells which would have fitted Bigler's .22 and Ogden's .25 were found by the kitchen window of Baxter's home. After the tragedy Bigler turned over his .38 to Ogden, telling him to get rid of it because it was registered in Salina. Ogden's automatic was found in Bigler's locked trunk, although he had told the sheriff he had not seen it since Ogden had gone hunting with it on that Sunday forenoon. From this very brief summary of the evidence touching the firearms it should be apparent that no error was committed in overruling the motion "to disregard all of the testimony with reference to the guns, the .22 and the .25, all exhibits in connection therewith."

3. Error is also urged on the instructions. These were thirty-three in number and occupy sixteen printed pages of the abstract. The two particularly criticized were Nos. 17 and 19. One of these

dealt with the defense of alibi, and the other with the criminal responsibility of defendant, although the crime charged against him was committed by Ogden, Sullivan and Britt, or any of them—"if it be a fact, that he, though not actually present at the time and place of the commission of the crime, either counseled, aided or abetted Aubrey Ogden, James Britt and Eldon Sullivan, or any of them, or conspired with them, to rob John Baxter; and if you find and believe from the evidence, beyond a reasonable doubt, that the crime charged was committed and that the defendant counseled, aided or abetted said other defendants, and Eldon Sullivan, or any of them or conspired with them to rob said Baxter, then you will be justified in finding the defendant guilty of the commission of the crime charged in the information." Defendant argues that these instructions were formulated on the theory that there had been a criminal conspiracy on the part of Bigler and his associates to rob and kill Baxter and that "there was absolutely not an iota of evidence as to any such conspiracy." As we read this record there was a plethora of evidence to prove a conspiracy to rob. The resultant murder flowed from the execution of that conspiracy. The visit of Bigler and Ogden at Baxter's two weeks before the murder was evidential that such a conspiracy was being formed. The gathering at Bigler's on Saturday night and the Sunday revolver practice were evidential. The pretended rabbit hunt of Ogden and Sullivan, to enable them to familiarize themselves with the situation of Baxter's premises, was inferably a preparatory step to execute such conspiracy. Evidence of conspiracy inhered in the statement of Bigler or Ogden, in the presence of both, that there was work to be done that Sunday night, which, in response to Britt's inquiry as to what sort of work, brought the information, "a hold-up." Bigler's act of taking command and giving directions when the four associates left Bigler's place that night to go to Baxter's, and the prearranged plan to provide an alibi for three of their number after the planned robbery should be accomplished, that Bigler should be left at his home and that the other three should hurry to Salina so that they might be seen thereabout and thus provide an alibi if they should be charged with its commission—these and other details fully justified the state's theory of a conspiracy and the court's instructions pertaining thereto.

The seventeenth instruction which dealt with the alibi offered by

defendant was a fair statement of the pertinent law; and the addition thereto, touching defendant's guilt if he aided, counseled or abetted the others in the crime, notwithstanding his possible absence from the scene of the crime at the time and place it was committed, was also pertinent and correct under the evidence.

Complaint is also made of instruction No. 28. Because it recites the testimony to which it pertained, we copy:

"There is testimony in this case offered by the state, of a certain expression or declaration made by defendant while alone in a cell in the jail of Saline county, it being claimed that such expression or declaration was heard by means of a dictaphone, and the jury are instructed that they cannot consider such testimony for any purpose whatsoever unless they find from the evidence, and are satisfied that the defendant was fully conscious of what he was saying, and that the expression or declaration was voluntary, and that he intended to say it."

The sheriff testified that when Bigler was alone in a jail cell, walking and talking to himself, he heard defendant say, "I can't confess, I don't dare confess, it will kill my father." Defendant's criticism of this instruction is that it singled out the evidence of this incident which thereby gave it undue emphasis. We think a fair reading of the instruction tends to depreciate the importance of this incident as evidence, if it did occur, rather than to emphasize it. Without some such precautionary instruction the jury might have given it undue significance. (*State v. Warner,* 129 Kan. 360, 282 Pac. 735, syl. ¶ 3.)

Complaint is also made of the trial court's refusal to give certain instructions requested by defendant. One of these would have told the jury that the fact that Ogden had pleaded guilty to the murder of Baxter and had been incarcerated in the penitentiary therefor should only be considered as affecting his credibility and for no other purpose. We think the court's general instruction touching the weight and credibility of the evidence and the apparent interest or want of interest of any witness in the case was quite sufficient. Requested instruction No. 16 would have told the jury that the evidence of an accomplice, while competent, should be weighed with great caution, and that the jury should not convict on the testimony of an accomplice unless it was corroborated on some material point in issue, and that "under the evidence in this case, the witness, James Britt, is an accomplice, and in weighing his testimony you should consider and apply this instruction." The record shows that

a more accurate instruction on this point was given. Moreover, corroboration of the testimony of an accomplice is not required. In *State v. Vandeveer*, 119 Kan. 674, 240 Pac. 407, it was said:

"Corroboration of the testimony of an accomplice is not absolutely necessary to its being given effect, although upon proper request a monitory instruction should be given regarding it. (*State v. Holton*, 111 Kan. 577, 207 Pac. 653.)" (675.)

4. The other arguments suggested by assiduous counsel for defendant have been carefully considered, but these call for no protracted discussion. There is nothing this court can do about the fact that, notwithstanding the array of character witnesses presented by defendant, the jury promptly returned a verdict of guilty. The fact that the verdict was guilty of murder in the second degree, when, of course, he was guilty of murder in the first degree or not guilty of anything, presents nothing for correction on appellate review. (*State v. Yargus*, 112 Kan. 450, 211 Pac. 121, syl. ¶ 2; *State v. Brundige*, 114 Kan. 849, 220 Pac. 1039, syl. ¶ 6; *State v. Uhls*, 121 Kan. 377, 382, 247 Pac. 1050.) A final point urged is that defendant was unfairly subjected to cross-examination which constrained him to admit that he had "been arrested three times, I think." This inquiry was allowable for whatever it might be worth in determining defendant's character and credibility, both of which questions were in issue (*State v. Pugh*, 75 Kan. 792, 90 Pac. 242; *State v. Smith*, 114 Kan. 186, 217 Pac. 307).

No material error is disclosed by the record, and the judgment is therefore affirmed.