No. 32,608

THE STATE OF KANSAS, *Appellee*, v. HARRY PYLE, *Appellant*.

(57 P. 2d 93)

Opinion filed May 9, 1936.

*Don Shaffer*, of Hutchinson, for the appellant.

*Clarence V. Beck*, attorney general, *Earl B. Swarner*, assistant attorney general, *C. W. Slifer*, county attorney, and *Robert Garvin*, special prosecutor, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: Harry Pyle was convicted of murder in the first de-

gree for alleged participation in the killing of August Reiter on the night of December 23, 1934.

The murdered man was one of two bachelor brothers who resided on a farm in Stafford county about a mile and a half southwest of a placed called Willinger filling station and about five and a half miles northeast of the city of Hudson. August and his brother Otto were wealthy farmers. They had $24,000 in government bonds buried near their home. The fact that the brothers possessed bonds was one of common knowledge in that locality, owing to the failure of a bank in which they had formerly kept their bonds.

John Schriner was an elderly tenant farmer, also a bachelor, who resided alone on a farm about half a mile south of the Reiter farm.

Harry Pyle and his son "Babe" Pyle had their habitation in a garage in the west part of Hutchinson. It had a dirt floor and was papered with cardboard. They were on intimate terms with one Lacy Cunningham, of Dodge City, who professed to be able to dispose of stolen bonds. In July, 1934, defendant and Cunningham discussed the subject of a large amount of bonds "that could have been got" a short time before. In their conversation mention was made of a Willinger filling station, and of bachelors.

On December 17, 1934, defendant sent a telegram to Cunningham at Dodge City, which read, "When can you come? Prospects good." Cunningham replied by wire, "Tomorrow morning." Accordingly next morning Cunningham arrived at Pyle's place in Hutchinson and stayed there two or three days. During part of that time, defendant's son, "Babe" Pyle was in jail on a charge of passing "hot" checks. In the course of conversations between defendant and Cunningham mention was again made of the Willinger filling station and of bachelors, and that any farmer who was getting "allotment" money would probably have some money.

During Cunningham's stay at Pyle's place in December, 1934, defendant's son Alan Pyle, otherwise called "Babe" Pyle, got out of jail and was present at further conversations between defendant and Cunningham, and on occasion participated in them. The transcript of Cunningham's testimony, in part, reads:

"Q. At any time that morning was anything said about bachelors?

. . . . . . . . . . . . .

"A. Well, they [Harry and Babe Pyle] said something about that they lived a mile west and a mile south of the Willinger filling station.

"Q. Who lived there? A. Bachelors.

. . . . . . . . . . . .

"Q. The bonds conversation was the only conversation you had about bonds—the one you had in July or August. A. Along in July or during that time.

"Q. And at that time what was said about it? Was there anything said about how many bonds? A. That seventy thousand dollars' worth is about the part of the amount that I ever heard.

"Q. You knew one of the Reiter's personally, didn't you, Mr. Cunningham? A. Yes, sir.

.    .    .    .    .    .    .    .    .    .    .    .

"Q. Before you had these conversations with the Pyles that you have told about, did you know or had you heard a rumor that these Reiters had some bonds?

.    .    .    .    .    .    .    .    .    .    .    .

"A. I think most everybody has knowed that.

.    .    .    .    .    .    .    .    .    .    .    .

[Counsel for Defendant]: "Wait a minute. I move to have it stricken out.

"The Court: Yes, sustained.

"Q. Do you know whether or not Harry Pyle knew anything about it at the time you were down there in December? A. I think so, yes.

"Q. Now did Harry Pyle ever say anything to you about your going in on a hijacking deal? A. Yes.

"Q. About when was that, Mr. Cunningham? A. About the second day I was down.

"Q. Now, tell the jury as near as you can what he said about hijacking or what you said. A. Well, he said we was a couple of chumps—that there was a fellow lived in Hutchinson been hijackin' fifteen years and never got in a crack.

.    .    .    .    .    .    .    .    .    .    .    .

"Q. What did you say to that? A. Well, I told him I was not—I was too old a man to go into that kind of business, and I was not going to have anything—any hand in any holdup.

.    .    .    .    .    .    .    .    .    .    .    .

"Q. Was there anything said about bachelors? And where they lived? A. Only what I have stated.

"Q. Only what you have stated? A. Yes, sir, as near as I remember.

.    .    .    .    .    .    .    .    .    .    .    .

"Q. Was anything said about a quick payoff? A. Yes. Alan spoke about if I could get a quick payoff.

.    .    .    .    .    .    .    .    .    .    .    .

"Q. Was anything said about disposing of bonds by you? A. Yes.

"Q. What was said about that? A. Well, I said I could get a contact.

.    .    .    .    .    .    .    .    .    .    .    .

"Q. Who did you say that to? A. I think to Harry.

"The Court: Harry Pyle, the defendant, you mean? A. Yes, sir."

During Cunningham's stay at the Pyle garage, Babe Pyle said he intended to get a "hot car to pull a job."

On Friday, December 21, Cunningham took defendant to Garden City to get defendant's automobile which his son, Babe, had left there. En route they halted at the farm home of one Roy Riley, some miles south of Lewis, with whom one "Bud" Richardson, sometimes called "Monk," occasionally stayed. Before leaving the Pyle garage, Babe said to defendant that he had no gun, and defendant replied that his was in a grip by the bed. As defendant and Cunningham journeyed on their way they had a conversation:

"Q. Anything said about 'Babe' Pyle on the road? A. Yes.

"Q. Tell the jury. A. We'd gotten out of town about fifteen miles and I told Harry that I was scared to death of 'Babe'—he was so crazy and wild, and he said, 'Maybe you'd better turn around and go back,' I says, 'I'll sure do it, if you want to go back,' and he says, 'No, I've got to get my car,' and so we went on.

"Q. Was there anything said at that time about whether you and Harry Pyle should be out at night if a job was pulled?

. . . . . . . . . . . . . .

"A. I think yes.

. . . . . . . . . . . . . .

"Q. What? A. We was foolish to be out that time of night if something happened.

"Q. Happened where? A. Any place.

. . . . . . . . . . . . . .

"Q. You testified in the preliminary hearing in this case, didn't you, Mr. Cunningham? A. Yes, sir; I testified in two hearings.

"Q. Yes. Now, to refresh you recollection, didn't I ask you this question, to which you gave the following answer—

. . . . . . . . . . . . . .

"Q. Didn't I ask you this question 'Didn't you tell him—say to him that if Alan was going to pull this job down by Hudson that we were damn fools for being out that night where we couldn't account for ourselves? Did you tell him something of that kind? A. Yes, sir; as near as I remember.

"Q. And is that the truth? A. That's about the conversation."

Bud Richardson was not at home, so the two men drove on to Kinsley where defendant met Bud Richardson, and he and defendant had several private conversations until a late hour that night. After midnight Cunningham and defendant drove to Dodge City, finished the night there, and on Saturday they proceeded to Garden City where defendant obtained his own car. Cunningham then returned to his home. That same night defendant returned to Dodge City and slept in Cunningham's bed, and left for Roy Riley's place shortly before noon next day, Sunday, December 23, 1934. Cunningham's testimony continues, in part, thus:

"Q. At any of these conversations you had with Harry Pyle before the

Sunday of the murder, did Harry Pyle say anything about that he needed money to keep 'Babe' out of jail? A. Yes, he told me that.

"Q. What did he say about that? A. Well, he said that 'Babe' had cost him lots of money and was still costing him, and he guessed he'd go to the penitentiary now on account of the hot checks.

"Q. Do you remember where you were when he told you that? A. I believe in his house.

"Q. That was while you were down there on this trip that you told about? A. At Hutchinson, yes, sir.

. . . . . . . . . . . .

"Q. Mr. Cunningham, I'll ask you whether at any of the conversations that you had with Harry Pyle there was anything said as to whether he would notify you if anything was pulled in Stafford county? . . . A. Yes.

. . . . . . . . . . . .

"Q. What did he say about that? A. Well, as near as I can remember it was said something about Dox Witt and bachelor brothers or something to that effect, and I said, 'Well, don't figure me in on anything in Stafford county.'

"Q. Did you tell him why? A. On account of the trouble that I had had.

. . . . . . . . . . . .

"Q. What did he say? A. Well, I believe he said he'd let me get in the clear—something like that.

"Q. Do you remember where that conversation occurred—when he told you that, Mr. Cunningham? A. No, I really couldn't recall just when that was.

"Q. Well, was it during this week preceding the murder? A. Yes."

. The foregoing may serve to portray the general background of the tragic violence which occurred the next Sunday evening in the homes of three peaceful farmers in the vicinity of the Willinger filling station. On that Sunday night, December 23, 1934, John Schriner finished his farm chores after dark, lit a fire, cooked and ate his supper, washed the supper dishes, then sat down and commenced to read a newspaper. Through his north window he saw the lights of an automobile coming; it drove into his yard and someone knocked at his door. He responded, "Come in." A man entered with a gun and struck Schriner over the head and knocked him down. The ruffian called to another man to come in. The two asked where his brother was. He replied he had no brother. They asked if he had money. He replied that he had a little and would get it. They said, "Is that all you got?" At first he said it was, but one of the bandits began to strike him with the gun and kick him, and eventually he said, "Well, I got a little more," and he dug up a few dollars he had buried in the cellar. Then the ruffians beat him over the head, and choked him, and tore off his clothes. They threatened to burn him and called to a third man whom they repeatedly called "Monk." "Monk" came. All three had their faces covered with handker-

chiefs, the bandit with the gun had a blue handkerchief with some white dots on it. Another of the bandits spoke of bachelors and wondered why so many bachelors lived thereabout. They also inquired who lived north of him, and he told them the Reiters did. Then they blindfolded him with a flour sack and led him to their car, thrust him, bleeding, into the back seat and proceeded to the Reiter farm. There they took off his blind, and ordered him to go to the door and call to his neighbors. He obeyed, called out, "Hello, August." The latter replied, "Hello, John, come on in," and met him at the door with a flash light. As Schriner entered the porch of the house, one of the bandits did likewise and stuck a gun in August's face and told him to "put them up." August apparently did not realize the situation, and failed to comply. The bandit told him a second time to "put them up," and grabbed August around the body and tried to put him down, but August Reiter was too strong for the ruffian, so the latter shot him through the body and he fell. His brother, Otto Reiter, heard the shot and the sound of scuffling and came to the door. One of the bandits felled him with his gun. The Reiter dog commenced to bark. The bandits silenced it with three shots. They began to search the house. Two of them dragged the wounded brothers into the kitchen, and asked where their money was. August told them it was in the cupboard. They obtained a small amount of money there. Then they began to beat August, asking where his bonds were. Apparently August lapsed into unconsciousness, so they turned on Otto, who was nearly unconscious. They threw water on him and he revived. They seized a butcher knife and threatened to cut his throat, to cut out his tonsils. They demanded to know where his bonds were. At first Otto told them that the bonds were in the Hudson bank, but the bandits apparently knew better and began to kick him, repeating their inquiry about the bonds. Otto courageously replied, "That is my business." Then they rammed the handle of the butcher knife down his throat and twisted it around, and then put fire behind him; they had already pulled down his trousers, but didn't burn him very much. They also stuck the blade of the knife into his mouth and threatened to gouge his eyes out. Then they turned their attention to Schriner, who had been kept blindfolded part of the time and began to torture him, until he appealed to Otto to give the ruffians the bonds. Otto agreed, and accompanied by two of the bandits he dug up the bonds from the place of their concealment ($24,000 worth), and also some

money, and handed them over to the bandits. During this orgy of violence the bandits kept their faces concealed, but one of the trio was repeatedly called "Monk" by his fellow-ruffians. When the bonds were obtained, one of the trio took the car and was gone for a time. It was the state's theory that he went to the Willinger filling station, but the keeper of that station was either lacking in perspicacity or frankness for he would testify no further than that a stranger "resembling Richardson a little bit" called at his filling station that fatal night between 9:30 and 10 o'clock p. m. Another witness who was at the filling station that night playing cards in an adjacent room picked out Richardson in the courtroom. Her testimony reads:

"Q. Did you notice a stranger there that evening? A. Yes, he came in while I was there.

"Q. Did you get a look at him? A. I got a glimpse at him.

"Q. Would you recognize that person now? A. I think I would.

"Q. Do you see that person in the courtroom? A. Someone that might resemble him a little bit.

"Q. Where is that person? A. Over there (indicating Richardson).

"Q. This gentleman sitting right here? A. Yes.

"Q. Well, was there anything peculiar about his actions that attracted your attention? A. Oh, he seemed a little nervous."

On this third bandit's return with the car, the three left, pretending they were going back to Schriner's to look for his bonds. They said perhaps they would be back in fifteen minutes, and warned their victims not to phone or do anything during that interval. After that time they might call a doctor for August Reiter, whom they had shot.

About 3 o'clock of the following morning, December 24, "Babe" Pyle called at an all-night restaurant and said to the proprietor, his wife and son being present, "In case anything turns up I stayed at your place all night."

Defendant and Bud Richardson turned up at Roy Riley's place on the morning following the crime. There were present several persons among whom it was agreed that if inquiry were made they would all declare that defendant and Richardson had spent the entire night there.

During the same forenoon following the night of the shooting and robberies, telegrams were sent to Lacy Cunningham at Dodge City, one by Babe Pyle, the other by defendant. One of them read: "Merry Xmas to you. Hope you are well—Babe." The other read:

"Come up for Christmas. Have a nice turkey and trimmings. Ans. by W. U.—Harry."

On December 26 defendant and his son were arrested by a sergeant of police and placed in the city jail in Hutchinson without a specific charge against them. They made no inquiry as to the cause of their arrest and were both very nervous. In their garage home were blood-stained handkerchiefs—one white, but dirty, also blood-stained neckties and clothing.

A week later Bud Richardson was arrested. Other arrests followed—that of Roy Riley, Lacy Cunningham, perhaps others. Babe Pyle and Cunningham were put in jail in Wichita. When that happened, Cunningham said to Babe, "For God's sake, Alan, what all has happened?" Babe replied, "Oh, Dad had to go out to that no good Bud."

August Reiter died of his wounds four days after he was shot. Otto Reiter lived to give testimony at defendant's preliminary examination and then committed suicide, apparently because of the after effects of the torture he had undergone that tragic Sunday night. Schriner survived his cruel ordeal to give testimony at defendant's trial, but died after that event.

Among various evidential facts at the trial was the discovery of dried blood on an inner tube which lay on the floor of Bud Richardson's car. Schriner had been thrust into that car bleeding from his wounds, and taken from his home to the farm of the Reiter brothers. Richardson's explanation of the blood was that he had helped to butcher a hog and had been given the liver and had carried it in his car. But there was testimony that the liver had been wrapped in paper; and an expert chemist who analyzed the dried blood testified touching scientific methods of determining whether blood is human or animal, and that on such test the dried blood found on the rubber tube in Richardson's car was human blood.

Touching the errors urged against the judgment and sentence which followed defendant's conviction, it is first contended that no conspiracy was proved to commit the robbery which culminated in the death of August Reiter. The purpose of this court in setting out at such length so many of the probative facts which led to this homicide has been that such errors as the one just suggested would scarcely need to be answered. Certainly the conspiracy was proved —the conspiracy to go hijacking, to rob certain bachelor farmers who owned a lot of bonds and who resided near the Willinger filling

station, and that Cunningham's part would be to find a market for the bonds, but who was not to be directly involved in any such crime within Stafford county because he had already had trouble there; and that Bud Richardson, otherwise known as "Monk," could be gotten into the conspiracy in his stead; that this conspiracy did not merely include the crime of robbery of the Reiters, but inferentially was to continue until the bonds were marketed and the proceeds distributed—until the "Merry Christmas, with turkey and trimmings" had been enjoyed by the robbers and murderers of August Reiter.

What is said or done by any of a group of coconspirators is admissible in evidence not only before their crime is committed, but afterwards, when it tends to show the further prosecution of its related incidents, division of its spoils, or avoidance of its consequences. (*State v. Mullins*, 95 Kan. 280, 291-295, 147 Pac. 828; *State v. Emory*, 116 Kan. 381, 225 Pac. 754; *State v. Harding*, 142 Kan. 347, syl. ¶ 2, 46 P. 2d 617.) Under this well-established rule the testimony concerning the conversation between Babe and Cunningham in the Wichita jail was competent; and under the same rule the testimony of the Hutchinson all-night restaurant keeper, Wilson, and that of·his wife and son touching Babe Pyle's suggestion that they should swear that he had passed the entire night of December 23 at their home was admissible.

It is next contended that defendant's demurrer to the state's evidence was erroneously overruled. That point calls for a careful examination of the evidence, which we have sufficiently summarized above; and in our view it was abundant to support the verdict of the jury. Any homicide committed in the course of perpetrating the crime of robbery or other felony is murder in the first degree under our statute. (R. S. 21-401; *State v. Roselli*, 109 Kan. 33, 198 Pac. 195; *State v. Jella*, 132 Kan. 509, 296 Pac. 350; *State v. Bigler*, 138 Kan. 13, 16, 23 P. 2d 598.)

See, also, *State v. Hauptmann*, 115 N. J. L. 412, 180 Atl. 809.

The only other complaint worthy of attention pertains to an irregularity committed by the trial court in respect to the giving of· an instruction, numbered 49, after the jury had deliberated on their verdict from Saturday evening until Monday forenoon. The court called the jury, and it reported that it had failed to agree, following which the court proceeded to give an instruction touching the mode provided by law for deciding lawsuits, the want of absolute certainty in a large proportion of cases, the necessity that the

verdict should be one to which every juror must assent as the result of his own conclusions, and therefore that the jurors should give due deference to the opinions of his fellows. The instruction reminded the jurors that they had been selected in the same manner and from the same source as any future jury would be chosen, and that there was no reason to suppose that this case would ever be submitted to twelve men "more intelligent, more impartial, more competent to decide it," that they should pay proper respect to each other's opinions, and "if much the larger number of your panel are for one side or the other, a dissenting juror should consider whether doubts in his mind as to the correctness of his conclusions are reasonable in view of the fact that doubts which he has made no impression upon the minds" of his fellow jurors. After many more words in the same strain the instruction concluded thus:

"Now I do not want you to understand by what I say that you are going to be made to agree, or that you are going to be kept out until you do agree, that is not the idea. But I do want you to understand that it is your duty, and you must make an honest and sincere effort to arrive at a verdict. Every man has a right to his opinion, but he has the right to consider that he might be mistaken one way or the other, and therefore a jury should be open-minded, they should listen to the arguments of others and talk matters over fully and freely and fairly, and make an honest effort as fair-minded jurors to come to a conclusion."

At 5 o'clock p. m. the jury returned into court and reported that they had not reached a verdict. The presiding judge repeated in substance instruction No. 49, and told the jury that if they could not agree on count *one*, they should take a ballot on count *two*, adding "you might disagree on one count and agree on the other." Four hours later the jury returned their verdict.

This court has frequently had to consider the matter of judicial pressure on the deliberations of the jury. Our reports are laden with cases bearing on this subject. An exhaustive review of them by Mr. Justice Thiele appears in one of our current decisions, *Eikmeier v. Bennett*, post, p. 888, 57 P. 2d 87. The general tenor of our decisions over a long period of years is one of disapproval, although we have seldom held that such instructions, belatedly given, were so prejudicially erroneous as to compel a reversal of the judgment. In each of them this court has endeavored to get a comprehensive view of the situation, the circumstances and the entire record and to rule accordingly. In the instant case the alert and skillful counsel for defendant who so assiduously guarded every

right of this defendant from the moment the case was called until judgment was pronounced interposed no objection to the belated instruction, and indeed, a painstaking perusal of the record leaves this court under the impression that defendant's counsel did not regard the instruction as unfavorable to his client at the time it was given. Be that as it may, there is an elementary rule of appellate practice which is that counsel cannot sit quietly by and permit the trial court to commit error prejudicial to his client without the interposition of a timely and appropriate objection thereto.

The approved practice of dealing with trial errors is to make timely objection to them as they arise. This procedure is substantially the same in criminal as in civil cases. (R. S. 62-1412 *et seq.*) Of course the former annoying prerequisite to an appellate review—that of excepting to adverse rulings as they arose and having such exceptions noted—has been abolished; but in *Bowen v. Timmer,* 87 Kan. 162, 123 Pac. 742, which took note of its abolition, it was said:

"Fairness to the court should prompt counsel to call attention to such errors seasonably, and they may be held to waive their right to relief where their conduct, expressions or silence show acquiescence in an erroneous declara-tion of law or evince a purpose to take advantage of unguarded expressions that would have been promptly corrected if pointed out." (p. 163.)

In *Emery v. Bennett,* 97 Kan. 490, 155 Pac. 1075, it was said:

"The duty of an attorney as an officer of the court is to assist the court in arriving at a just and lawful conclusion and judgment in every cause; and when he has a proper objection to the pleadings or proceedings, he should point out clearly and specifically the grounds for his objection; and when he fails to make it with such clearness and precision that the court can understand it, he will ordinarily be held to have waived his objection." (Syl. ¶ 2.)

*State v. Bell,* 121 Kan. 866, 869-870, 250 Pac. 281, was a felony case where the state had overlooked the matter of proving the venue; but counsel for defendant interposed no objection, or none sufficiently clear for the trial court to discern his point. This court said:

". . . The rule has frequently been announced by this court and should be applied here, that whenever a litigant has a meritorious proposition of law which he is seriously pressing upon the attention of the trial court, he must raise that point in such clear and simple language that the trial court can understand it, and if his point is so obscurely hinted at that the trial court quite excusably may fail to grasp it, it will avail naught to disturb the judg-

ment on appeal. (*State v. Everett,* 62 Kan. 275, 62 Pac. 757; *State v. Balliet,* 63 Kan. 707, 66 Pac. 989; *Riverside v. Bailey,* 82 Kan. 429, 108 Pac. 796; *Emery v. Bennett,* 97 Kan. 490, 155 Pac. 1075; *Livingston v. Lewis,* 109 Kan. 298, 301, 198 Pac. 952; *Brick v. Fire Insurance Co.,* 117 Kan. 44, 230 Pac. 309; *Collis v. Kraft,* 118 Kan. 531, 532, 235 Pac. 862.)" (p. 869.)

(See, also, *Clark v. Linley Motor Co.,* 126 Kan. 419, 268 Pac. 860; and *State v. Woodman,* 127 Kan. 166, 168, 272 Pac. 132.)

The authorities just cited similarly dispose of certain minor procedural irregularities of which counsel complain here but did not object to at the trial.

A painstaking examination of this record reveals nothing approaching the gravity of prejudicial error nor any misgiving as to the justice of the result. The judgment is therefore affirmed.

THIELE, J. (concurring specially): I concur fully with paragraphs 1 and 2 of the syllabus and the corresponding parts of the opinion.

As to paragraph 3 of the syllabus and the corresponding part of the opinion, I concur fully in the disapproval of the instruction given. It is with reluctance I concur in holding that the giving of the instruction complained of formed no basis for reversible error. I do so concur solely because, in addition to the reasons set out in the opinion, the motion for a new trial did not specify as one of the grounds the giving of the instruction of which complaint is now made, the complaint being rather that "the jury was influenced by the court to render their verdict on account of abuse of discretion of the court in polling the jury in open court."

SMITH and WEDELL, JJ., join in the foregoing specially concurring opinion.