No. 35,496

In the Matter of the Application of HARRY PYLE (HARRY PYLE, *Petitioner*, v. MILTON F. AMRINE, Warden of the Kansas State Penitentiary, *Respondent*).

(156 P. 2d 458)

Opinion filed March 10, 1945.

*Arthur H. Snyder,* of Hutchinson, argued the cause for the petitioner.

*Carl A. Ballweg,* assistant attorney general, argued the cause and *A. B. Mitchell,* attorney general, was on the briefs for the respondent.

The opinion of the court was delivered by

SMITH, J.: This is an original proceeding for a writ of habeas corpus. The question with which we are immediately concerned is whether or not a motion of the respondent to dismiss the petition because petitioner has not complied with our order heretofore made to make the petition more definite and certain in certain particulars should be sustained. Various phases of this litigation have been before us in the past—once when the petitioner's conviction for murder and robbery was affirmed. (See *State v. Pyle*, 143 Kan. 772, 57 P. 2d 93.) It was here again when an order of the district court of Leavenworth county dismissing a petition for a writ of habeas corpus was affirmed in a *per curiam* opinion. (See *In re Pyle*, 153 Kan. 568, 112 P. 2d 354.) Later, on December 11, 1941, we made an order permitting Pyle to file an original petition for a writ of habeas corpus in this court. On the same day we made another order denying the petition. We later denied a rehearing. On appeal to the Supreme Court of the United States a writ of certiorari was allowed. In the case of *Pyle v. Kansas*, 317 U. S. 213, the Supreme Court of the United States reversed our order dismissing the original application of Harry Pyle for a writ of habeas corpus and directed us to proceed to hear it. In the opinion the court pointed out that the application for a writ had alleged that petitioner's imprisonment was the result of his being deprived of rights guaranteed him by the constitution of the United States in that the prosecuting authorities in the Kansas court had obtained his conviction by the presentation of testimony known to be perjured and by the supression of testimony favorable to him. The court pointed out certain statements in the abstract which substantiated these charges and referred to exhibits accompanying the application wherein witnesses at the trial had made affidavits after the trial that their testimony used at the trial was perjured. The court pointed out that no return had been made to the application for a writ in this court and that the allegations of the application were nowhere refuted or denied in the record. The court held that if these allegations were true they entitled petitioner to release from his present custody. Amongst other things the court said:

"In view of petitioner's inexpert draftsmanship, we of course do not foreclose any procedure designed to achieve more particularity in petitioner's allegations and assertations."

The mandate reached us January 14, 1943. In conformity with

the statement just quoted and on motion of the respondent we ordered petitioner to make his petition more definite and certain. On December 23rd the petitioner asked us to appoint Mr. Arthur H. Snyder of Hutchinson as his counsel. On February 21, 1943, we did appoint Mr. Snyder. On February 26, 1943, we were advised by letter from Mr. Arthur H. Snyder that he accepted the appointment upon the condition that he would aid Mr. Walter Bullock of Dodge City, Kan., who was to be senior counsel. In fairness to all parties it should be noted that on March 9, 1943, Mr. Walter Bullock, of Dodge City, wrote the Chief Justice from there and spoke of the difficulty he was having obtaining certain transcripts, being that of the trial of *State v. Hudson* and also the transcript of *Otto Chadd v. The Board of County Commissioners of Stafford County*. On March 6, 1943, Mr. Arthur H. Snyder wrote the Chief Justice to the same effect. He spoke of the transcript in the cases of *State v. Richardson* and *State v. Hudson* and *State v. Pyle*. He spoke of the fact that Harry Pyle had no means with which to buy these transcripts and of its being necessary for him to have them before he could draw an amended petition. On April 20, 1943, our Chief Justice addressed a letter to petitioner, Mr. Walter Bullock and Mr. Arthur H. Snyder, in which he called attention to the fact that nothing had been filed in response to our order of February 1st and stating that it seemed to him that sufficient time had been given to prepare the amended petition and urged them to get this matter attended to so the matter might proceed without delay. It does not appear in this record, but this court is aware of the fact that Mr. Walter Bullock was ill for sometime about this time and that he subsequently died.

At any rate Mr. Bullock for the petitioner filed in this court on May 22, 1943, an amended petition for a writ of habeas corpus in attempted compliance with our order. In this petition he referred to certain court files as follows:

"1.

"A. The Transcript of the testimony of Otto Reiter, taken at the Preliminary Hearing of Harry Pyle, before a Justice of the Peace, in Stafford County, Kansas, marked 'Exhibit A' and made a part of this Amended Petition.

"B. The files in Case No. 7834, in the Case of State of Kansas vs. Harry Pyle, in the District Court of Stafford County, Kansas, together with the transcript of the testimony, marked 'Exhibit B' and made a part of this Amended Petition.

"C. The files in the Case of State of Kansas vs. Murl Hudson, in the District Court of Stafford County, Kansas, which was tried on or about the 12th day of

October, 1936, marked 'Exhibit C' and made a part of this Amended Petition.

"D. The files in Case No. 22,220, in the District Court of Reno County, Kansas, being a Petition for Writ of Habeas Corpus, wherein Harry Pyle was Petitioner, and Noah Wiggins was the Respondent, marked 'Exhibit D' and made a part of this Amended Petition.

"E. The files in Case No. 830, in the District Court of Stafford County, Kansas, *Otto Chadd vs. Board of County Commissioners, et al.*, marked 'Exhibit E' and made a part of this Amended Petition.

"F. The files in Case No. 22,339, in the District Court of Reno County, Kansas, *Fannie Riley vs. N. S. Wiggins, et al.*, marked 'Exhibit F' and made a part of this Amended Petition.

"G. The files in Case No. 22,772, in the District Court of Reno County, Kansas, wherein Roy Riley was Plaintiff, and Noah Wiggins, et al., were Defendants, marked 'Exhibit G' and made a part of this Amended Petition.

"H. The files in Case No. 7879, in the District Court of Stafford County, Kansas, wherein the State of Kansas was Plaintiff, and Roy Riley was Defendant, marked 'Exhibit H' and made a part of this Amended Petition.

"I. The files in the Case of *State of Kansas vs. Roy Riley*, No. 7891, in the District Court of Stafford County, Kansas, wherein Roy Riley was charged as Accessory after the fact, in the murder of August Reiter, marked 'Exhibit I' and made a part of this Amended Petition.

"J. The Affidavit of Jess Lanam, sworn to before Horace Watkins, a Notary Public, in Ford County, Kansas, made on or about the 26th day of July, 1935, in the County Jail of Ford County, Kansas, in which Will Zarbucken, Sheriff of Ford County, Kansas, and Morton Cole, Assistant Attorney General of Kansas, were present, marked 'Exhibit J' and made a part of this Amended Petition."

These exhibits were none of them attached to the amended petition. Since they were court files, however, we have sent to the clerks of the courts for them and they have been sent in to us. We have Exhibit A. It is a part of the transcript in the case of *State v. Harry Pyle.* We have the files in the case of *State v. Pyle*, being Exhibit B, including the transcript. We do not have the files in the case of *State v. Murl Hudson*, being Exhibit C, but we do have the transcript in that case. Exhibit D is an application for a writ of habeas corpus for Harry Pyle. That has been sent to us and it appears that the writ was not finally issued because Pyle was in the custody of the respondent. Exhibit E is an action wherein the reward money was divided among the officers who were responsible for the solution of the case. It does not appear to be of any importance since no reference is further made to it. Exhibits F and G are each damage actions against the various officers in the case, which were dismissed at the cost of plaintiff. Exhibit H is the file in the case wherein Riley was arrested and charged with murder. No further reference

is made to that case so it is doubtful whether it is of any importance. Exhibit I is another case of the same nature. Exhibit J is an affidavit of Jess Lanam, to which no further reference is made.

The amended petition alleged that certain testimony was perjured without stating what witness had given the perjured testimony and that certain authorities, naming a number of officials but none of the prosecuting attorneys, knew of the suppression of evidence and of perjured testimony.

To this petition, respondent on June 7, 1943, leveled a motion to strike and in the alternative to make it more definite and certain. The motion to strike was on the ground that the petitioner had not complied with our order of February 1, 1943. This motion we overruled on June 21, 1943. On the same date we sustained the motion of respondent to require the petition to be made more definite and certain in the following particulars:

"1. That the allegedly false testimony and evidence introduced by the State of Kansas in the trial of the petitioner, with the alleged knowledge that such evidence and testimony was false and perjured be set out verbatim.

"2. That the names of witnesses whose testimony was allegedly suppressed be set out with a detailed description of the evidence each witness would have given in the absence of such alleged suppression.

"3. That the authorities who allegedly knew false evidence was used in the trial of petitioner, or of the suppression of evidence be named, their official connection with the trial of petitioner be designated, and the specific evidence which each such official knew to be false or suppressed be specified.

"4. That the officials who allegedly suppressed evidence favorable to petitioner be named, their official capacities designated, the acts by which they allegedly suppressed such evidence be described and the specific evidence which each official allegedly suppressed by said acts be specified.

"5. That the specific portions of records which allegedly show suppression of evidence favorable to petitioner, and the knowing use of false and perjured evidence and testimony be set out in detail."

On the same date on the motion of respondent we ordered the issue of fact in the case confined to whether or not petitioner's imprisonment resulted from perjured testimony knowingly used by state authorities to obtain his conviction or from the deliberate suppression by those same authorities of evidence favorable to him.

On October 18, 1943, petitioner himself filed what he termed a motion to subpoena records. In this motion he pointed out that he had appealed to this court from his conviction; that a transcript of the evidence taken at that trial had been made and was in the possession of the counsel who represented him at the trial. He also referred to a trial that had occurred in Stafford county, Kansas en-

titled *State v. Murl Hudson* and asked that the record of the court reporter in that case be reduced to typewriting and delivered to him. He also referred to the case of *State of Kansas v. Bud Richardson,* which was tried in the District Court of Stafford county and asked that the record of the court reporter in that case be reduced to typewriting and delivered to him. He stated he needed this record in order to enable him to comply with our order of June 21st.

As to this motion, he was advised by letter under date of October 23, 1943, he did not have a good petition on file and no order could be made by us until he did have.

On July 5, 1944, we on our own initiative made an order in which we took notice of the fact that petitioner had not complied with our order of June 7, 1943, to make his petition more definite and certain and that the action was not being prosecuted with any degree of diligence.

We ordered the cause should be set down for disposition on September 29, 1944, at which time it would be called for hearing and if not ready then for presentation and submission it would be dismissed.

We were advised by telephone it would be inconvenient for Mr. Snyder to appear before the court on September 29th, so arrangements were made for him to be heard on September 30th, 1944. At that time he did appear before us in the chambers of the Chief Justice. The proceeding was more a conference than a hearing. Mr. Snyder pointed out that he had taken the appointment as counsel only with the understanding that he would assist Mr. Walter Bullock, who was to be chief counsel. He also pointed out that Mr. Bullock had since died and at the time of his death had in his possession the office files having to do with the matter. He referred to the difficulty he was meeting in obtaining records of various trials, which were necessary for him to have in order to comply with our order to make more definite and certain. We advised him that there was no disposition on our part to hurry him unduly but that some disposition must be made of the matter. We called his attention to the fact that the legislature at the session of 1943 had made an appropriation for the purpose of defraying the expenses of counsel whom we should appoint to represent the petitioners in habeas corpus actions and also for the purpose of paying counsel so appointed a fee. We urged that he take whatever reasonable steps he should deem necessary and to prepare and file a petition that would comply with our order.

On October 30, 1944, he did file an amended petition. Counsel for the respondent on January 19, 1945, filed a motion to dismiss this petition because it did not comply with our order in certain particulars. This motion was duly briefed and submitted to us on January 25, 1945, at our first regular session after the motion was filed. At this hearing it developed that counsel had finally succeeded in obtaining a transcript of the evidence in the case of *State v. Pyle* and *State v. Hudson* and that as much of the transcript in *State v. Richardson* as was necessary to a presentation of this matter was part of the transcript in *State v. Pyle,* being the testimony of two witnesses used on the presentation of the motion for a new trial in that case. They were available to us in consideration of this motion.

Counsel for petitioner with commendable honesty and candor has made only such allegations as he deemed the facts as he saw them warranted. This somewhat lengthy statement of preliminary matters is made so that the reason for the long time this cause has been pending here might appear clear.

Before proceeding to a consideration of the merits it will be helpful to set out some facts about the case which all parties concede to be true.

On December 23, 1934, during the early part of the evening, August Reiter was shot and mortally wounded and he and his brother Otto were robbed of some money and about $24,000 in government bonds. The crime occurred in their farm home in Stafford county. They were bachelors and lived alone. Just about this time the governor had instructed the head of the highway patrol to use the patrol for the suppression of crimes of violence. Soon after the crime was discovered the sheriff of Stafford county was notified. In a very few hours he had advised the highway patrol and many patrolmen were dispatched to the vicinity.

August Reiter did not die until the following day. A neighbor by the name of Schriner had been kidnapped and taken to the Reiter home, so he and Otto Reiter were available. The bandits, who appeared to be three in number, however, had been disguised with handkerchiefs over their faces so that neither of the survivors was able to identify them.

Without burdening this opinion with too many details it may be stated that suspicion was first directed to Babe Pyle, the son of petitioner. Harry and Babe were both taken into custody and their movements during the hours just before and just after the

crime were checked. Harry had been seen in company with one Lacy Cunningham, of Dodge City, several days before the crime. The officers advised the sheriff of Ford county to arrest Cunningham. The sheriff did this and on looking through Cunningham's room he found two telegrams, one reading "Merry Christmas. Hope you are well." This was signed "Babe Pyle." The other was "Come up for Christmas, have a nice turkey and trimmings." It was signed "Harry." Acting on this suspicious circumstance, the officers quizzed Cunningham, with the result that he later became a witness for the state in the trial of Harry Pyle and related a story of a visit he made to Hutchinson to talk with the Pyles in August of 1934, and also a visit he made there just before Christmas in response to another wire. He disclosed that when he was in Hutchinson in August there had been some talk between him and both Harry and Babe about their knowing where there were some bachelors who had bonds and that they could get hold of these bonds easily. It seems that Cunningham represented himself to have connections to whom he could dispose of stolen bonds. He also told how in response to a telegram from Harry Pyle he had gone to Hutchinson on December 17, 1934. He had seen Harry and Babe at their house and had talked about the bachelor brothers and the Willinger filling station, near which the Reiters lived, and the fact that he could dispose of stolen bonds. He had stayed around Hutchinson from December 17 until the 21st when he and Harry left Hutchinson. Harry went with him because Harry's car was at Garden City where it had been left to be repaired. He started out with the intention of taking Harry on to Garden City because there was some land he could look at just beyond Garden City and Harry had to go to Garden City to get his car. He told about how on the way they had stopped at the home of a man named Roy Riley near Kinsley and about a man for whom Harry Pyle was looking, who was not there, and that they went into Kinsley, and found him and that Harry Pyle and Roy Riley and Richardson, the man for whom Harry Pyle was looking, had had some conversation. That was the night of the 21st. The next night Harry Pyle stayed all night with Cunningham at Garden City. Cunningham last saw Harry Pyle the morning of the 23rd as he was having a tire fixed at a garage in Dodge City.

After this talk with Cunningham the officers arrested Roy Riley and Richardson, who is referred to during the various trials as

Bud Richardson or Monk Richardson. The officers were able to get Riley to make a statement.

This statement was offered in evidence by the state at the trial of *State v. Pyle.* Objection to it was sustained. A copy of it is part of the transcript of the record of *State v. Pyle.* The substance of it will be given here, however, on account of the light it throws on the legal point at issue. He stated that he lived in the country in Edwards county; that Harry Pyle came to his house on December 23, 1934, about three o'clock in the afternoon; that he, himself, his wife, Bud Richardson and his wife and Richardson's child were there and a Mrs. Tony Welch; that Richardson and Harry Pyle left there about eight fifteen that evening and did not come back until about seven o'clock the next morning; that when they did come back there was talk between Riley and his wife, Richardson and his wife and Harry Pyle about planning an alibi for Pyle and Richardson that they were to swear that Pyle and Richardson slept there all night and in what beds they slept. He also stated that there were statements by Pyle and Richardson that there had been quite a jam the night before.

The state reformatory is located at Hutchinson, Kan. Soon after he made this statement Riley was given into the custody of the superintendent of that institution. He remained there until some time before the trial of Harry Pyle, at which time his wife called for him with the lawyer who conducted the defense of Harry Pyle and he left the reformatory.

While he was at the reformatory a conversation occurred between Riley and Harry Pyle, at which Jerome Wilson, county attorney of Edwards county, and some other officers were present. Mr. Wilson testified as to this conversation at the trial of Harry Pyle. Reference will be made to this conversation later in this opinion.

As a result of the investigations which have been detailed here Babe and Harry Pyle and Richardson were charged with murder and robbery. The conduct of the trial was in charge of Robert Garvin, a reputable member of the bar of Stafford county and now the judge of the district court of that district, who was employed by the county commissioners of the county as special prosecutor, and C. W. Slifer, the county attorney of that county. Harry Pyle was tried first and convicted. He appealed to this court where the conviction was affirmed. (See *State v. Pyle,* 143 Kan. 772, 57 P. 2d 93.) Babe Pyle was next convicted. He appealed and the appeal was dismissed.

It was reinstated and again dismissed. Harry and Babe Pyle are now in the penitentiary. Richardson was tried and acquitted.

There is another matter which must be stated now in order that there may be a clear understanding of this matter. Just how it came about does not appear in this record but one Murl Hudson was arrested and charged with the murder of August Reiter and the robbery of both the brothers. At his trial Babe Pyle, a man named Stover, and a woman who had been living with Hudson, testified that Hudson, Babe Pyle and Stover committed the crime. Hudson was convicted and is now in the penitentiary. Stover was never tried.

Now as to this amended petition. It first sets out an excerpt from the testimony of one Truman Reynolds given for the state at the trial of petitioner. It alleges that this testimony was perjured. Reynolds testified that he was at the home of Harry and Babe Pyle when they were both present during the summer of 1934 and that Babe said in the presence of Harry that he knew where they could pull a little job; that it was out west; that he could get some money there and that a car would have to be used. The petitioner attached to his petition an affidavit of Reynolds wherein he stated that the evidence he gave was not true and that he had been forced to testify for the state by threats of jail and physical harm. The petition stated that petitioner was unable to state the names of the officers responsible for the evidence of Reynolds. The United States Supreme Court referred to the allegations in the original petition as to the testimony of Reynolds and that the prosecution used it knowing it to be false. The theory upon which the appeal in *Pyle v. Kansas,* supra, was decided was not simply that the testimony was perjured, but that the officers in charge of the prosecution knew it to be perjured. Of course it is repulsive to every idea of the proper administration of justice that a prosecuting attorney should put a witness on the stand and use his testimony against one charged with crime when he knows the testimony is perjured. Every fair-minded person would condemn such a practice. It is another thing, however, to hold that a witness can testify one way at the trial and then afterwards secure the release of the accused by testifying that the testimony he gave was false. In order to constitute grounds for release on a writ of habeas corpus it must appear that the officers in charge of the conduct of the prosecution knew it to be false. There is no allegation here that either Mr. Slifer or Mr. Garvin

knew that this testimony was false. The precise allegation in the petition with reference to this testimony is as follows:

"That this petitioner is unable to state definitely the person who suppressed, and obtained the perjured testimony, but this petitioner believes that all of the officers of the State Police participated in the investigation, including Otho Lomax, Rueben W. Welch, former sheriff, Dale Gossett, George Caraway and Jerome Wilson, former County Attorney."

Again the petition contains the following allegation:

"Petitioner refers to Exhibit C, the statement of Truman Reynolds received in the mail by attorney for the petitioner this 26th day of October, 1944, and states to the Court that the evidence of Truman Reynolds set out and commencing on page 1 of Amended Petition is false or colored testimony developed for the purpose of convicting this petitioner. And petitioner is unable to state the names of the officers or parties responsible for the said evidence of Truman Reynolds."

It will be seen that neither of these paragraphs constitutes an allegation that any officer charged with the conduct of this prosecution knew that this testimony was false if in fact it was false. The situation here is a good argument for the rule just stated. Only three persons really know whether the testimony was false. One is Reynolds himself. The other two are Babe Pyle and Harry Pyle. Reynolds took the stand and testified one way. He now apparently wants to testify differently. There is no way on earth by which the prosecuting attorneys could know that the story Reynolds was offering to tell on the witness stand was false. They were not mind readers. Quite often a confession is made by one accused of crime and then repudiated, and the accused claims he did not make it voluntarily, but on account of having been put in fear. The confession is then offered in evidence and the question is submitted to the jury as to whether the confession is true. Such is not the case here, however.

After a study of the decision of the United States Supreme Court in *Pyle v. Kansas,* supra, we have concluded that there are not sufficient allegations to warrant the appointment of a commissioner to take testimony and make findings of fact as to this evidence.

The next phase of the petition with which we shall deal concerns the statement made by Riley. It will be remembered that he was at the reformatory for a while after he gave the statement to the officers, and later left with his wife. He was called to the witness stand by the state in the trial of *State v. Harry Pyle.* He refused to testify on the advice of counsel on the ground that it might incriminate him.

The state then took advantage of the rule that statements in conversations with the accused may be used against him.

Jerome Wilson, the county attorney of Edwards county, took the stand and testified as to a conversation he heard between Riley and Harry Pyle at the reformatory. Wilson had taken Pyle to the reformatory and confronted him with Riley. Wilson testified that Riley in his presence had told Pyle that he, that is, Pyle, had not stayed at his house all night the night of the crime and that he and Richardson had left there between seven and seven thirty on Sunday evening, the night of the murder and robbery, and had not returned until eight o'clock the next morning. Wilson also testified that Riley told Pyle in that conversation that an alibi was framed there at Riley's home between Bud Richardson and Harry Pyle and Richardson's wife and Riley's wife; that in this conversation Pyle said to Riley:

"Roy, you know we stayed at your place that Sunday night."

And Riley said:

"No you didn't. . . . I've lied for you as long as I can, but they know too much about this, and you didn't stay there that night. You and Bud left and didn't come back till next morning."

In his amended petition petitioner sets out an excerpt of Wilson's testimony about as the foregoing. He also sets out an excerpt of the testimony of Mrs. Riley, being a part of the cross-examination of her by counsel for the state after she had testified on behalf of the defendant in the case of *State v. Harry Pyle.* This testimony was to the effect that she had brought an action in Kinsley and one in Hutchinson against the sheriff and county attorney of Edwards county, the sheriff of Stafford county, and one Keeling, and Mr. Lomax for mistreatment of her husband. These two actions were dismissed on motion of the plaintiff, but what place the testimony with reference to them has in this petition does not appear.

The petitioner next sets out an excerpt of the testimony of Thelma Richardson offered in behalf of the defendant where the defendant offered to have the witness testify to what Roy Riley, after he came back from the reformatory, said to her about the statement he had made to the officers at Kinsley. The objection of the state to this testimony had been sustained. It is difficult to understand what place this testimony has in the petition. No further reference to it or the testimony of Mrs. Riley is made in the petition.

Petitioner then makes the following allegation:

"Petitioner further states that the statement of Roy Riley, as testified to by Mr. Wilson, County Attorney of Edwards county (page 5, Amended Petition) must be false when considered with the evidence of John Schriner, (Exhibit A, Amended Petition) and (Exhibit B, Transcript State v. Hudson, attached thereto)."

This is not an allegation of any fact with which we are presently interested. It is an argument only.

The petition next contains the following paragraph:

"Petitioner further states that, he is unable to state the names of the parties responsible for the false statement of Roy Riley and that nothing herein contained is intended to infer or charge Mr. Wilson, the witness, with having made or given untrue testimony; that this charge is directed to the statement of Roy Riley only."

It will be seen that the above allegation does not meet the requirements already laid down in this opinion as to the procuring of a conviction by use of perjured testimony on the part of the prosecuting officers knowing it to be perjured. In fact petitioner concedes that the conversation about which Wilson testified between Riley and Harry Pyle actually did occur. His argument is that the allegation that some officer or group of officers caused Riley to make the statement in the first place and the prosecuting attorneys subsequently caused Wilson to testify to the conversation between Pyle and Riley comes within the rule announced by the United States Supreme Court. We cannot agree with petitioner in this argument.

On account of the nature of this crime and due to the fact that the people suspected of the crime lived at some distance from each other, the investigation covered several counties. The names of N. D. Gossett, the sheriff, and Jerome Wilson, the county attorney of Edwards county, Reuben Welch, the sheriff, Jay Stanbaugh, the undersheriff, C. W. Slifer, the county attorney of Stafford county, Mr. Osinbaugh, the undersheriff of Reno county, Vance Houdyshell, the chief of police of Great Bend, George Caraway, sheriff of Barton county, Will Zurbucken, the sheriff of Ford county, Mr. Docking, state patrol officer, A. P. Keeling, O. W. Lomax, Ellis Christiansen, Earl Preston and John De Long of the Highway patrol, all appear in this record. They all took part in the investigation at one time or another. We cannot hold that the fact that some of them may have caused a witness to make a false statement during the investigation would prevent the use of a voluntary statement made by the witness in the trial of the accused. No one claims that Riley was being

coerced or was under any fear when he made the statement about which Wilson testified. The fact that he may have been coerced into making a statement in the first place does not bring the case under the rule announced by the United States Supreme Court. There is no allegation that the fact, if it was a fact, that Riley's statement was untrue was brought to the attention of either Slifer, the county attorney of Stafford county, or Mr. Garvin, the special prosecutor.

As to the Wilson testimony, the petition contains a further allegation, as follows:

"Petitioner further states that, the Riley statement and the confronting of Harry Pyle, as testified to by Mr. Wilson (page 5 Amended Petition) was false and intended to be false and was made for the purpose of obtaining a conviction of Harry Pyle for the reason that Bud Richardson, another defendant in the same case, was not confronted by Roy Riley but ignored; and that all the effort of the officers was used to make evidence to convict Harry Pyle, although the statement Riley testified to by Wilson included Bud Richardson, and yet the officers only confronted Harry Pyle with Riley and ignored Bud Richardson, who was also at the reformatory at the same time that Riley purportedly confronted this petitioner."

This paragraph does not present any issue of fact. It is but little more than criticism of the prosecuting officers in their management of the case of *State v. Richardson.*

The petition next sets out a statement that Riley made to Walter Bullock wherein Riley stated that Lomax, Preston, Cristy, Gossett, Welch, Slifer and Wilson all questioned him at Kinsley, and at the time of questioning threatened to beat him unless he told them certain things that they wanted him to say; that he was questioned from three p. m. to six almost continuously; that he told them that Harry Pyle and Bud Richardson stayed at his house all that night. These allegations have no place in this petition. There is no allegation whatever that any of these facts were called to the attention of either of the prosecuting officers.

The petition next contains an excerpt from the opening statement of counsel for the state at the trial of *State v. Harry Pyle.* In this excerpt counsel for the state stated that when the officers picked up Mrs. Richardson and Mrs. Riley, Harry Pyle, Richardson and Riley they all told different stories about which beds they slept in that night. The petition alleges that this statement set out the theory of the state's case.

The petition then contains the following allegation:

"Petitioner further states that the only means by which the State could

sustain the theory would be to have evidence to overcome the statements of Harry Pyle, Bud Richardson, Roy Riley, Mrs. Roy Riley and Mrs. Richardson. And petitioner states that the State of Kansas used Roy Riley to confront Harry Pyle, as testified to by Mr. Wilson, to refute the truth and the actual fact."

This is more an argument than a statement of a fact. If, however, it be given a broad construction as a statement of fact we think the wrong conclusion is drawn from it by petitioner. If the officers thought Riley had told them the truth it was their duty to safeguard their case by confronting Pyle with Riley. It is as reasonable to draw one conclusion as the other from this allegation. We cannot assume in the absence of a clear, unequivocal allegation to the contrary that the officers were bent on a scheme to convict an innocent man.

We conclude that the allegations as to the testimony of witness Wilson do not present any issue that requires the appointment of a commissioner.

We shall now consider the allegations of the petition as to the suppression of evidence. It will be remembered that the trial of Richardson occurred after those of Babe and Harry Pyle. The motion of Harry Pyle for a new trial was argued after the trial of Richardson had ended. A transcript of the testimony of George Caraway, who testified on behalf of the state in the trial of *State v. Richardson* and that of Vance Houdyshell, who testified on behalf of the defense in that trial, was introduced in evidence and urged as newly discovered evidence entitling Harry Pyle to a new trial.

Petitioner sets out an excerpt from the record of the cross examination of George Caraway at the trial of *State v. Richardson.* In this testimony Caraway told about going to the Reiter house the morning after the murder in company with Reuben Welch, Mr. Houdyshell and one of the Willingers; that they found some guns out in the yard and took them in the house to dry so that they might look for fingerprints; that they put them on a chair by the stove and when he went to look at them later Willinger had taken them home. In this testimony he also told about having looked over the Schriner house and being unable to find any fingerprints. As to this testimony, petitioner states that he is unable to state definitely who suppressed it, but he names Otho Lomax, of the highway patrol, Reuben W. Welch, former sheriff, George Caraway and Jerome Wilson, county attorney of Edwards county. There is no allegation that this evidence was ever brought to the attention of counsel for

the state. The county attorney and the special prosecutor were in charge of presenting the evidence to the jury. Theirs was the final authority as to what should or should not be presented to the jury out of the mass of facts and data gathered by the investigators. In the absence of an allegation that one or the other of counsel knew about this evidence, there is nothing alleged in connection with the testimony of Caraway that would warrant the submission of this matter to a commissioner of this court. Prosecuting attorneys are charged with the duty of presenting the evidence to the jury in such a manner as to present the true picture of the situation. In doing so they must of necessity exercise their judgment. In the absence of allegations amounting to bad faith or willful oppression in office we would be loath to hold that because the prosecuting officers saw fit to present a certain piece of evidence to a jury in one case and decided not to use it in a companion case, the convicted defendant in the first case should be released on a writ of habeas corpus on the ground that evidence favorable to him had been suppressed.

There is another reason why this allegation does not state a ground for release. Under our criminal procedure, newly discovered evidence is one of the grounds for a new trial (G. S. 1935, 62-1603). One of the grounds on which a new trial for Harry Pyle was asked was newly discovered evidence. His counsel had the transcript of this testimony and presented it to the trial court when arguing this motion. The trial court was the same one before whom the other trials had been had. The trial court did not deem the proffered evidence sufficiently material to require a new trial. This denial of a new trial was one of the grounds upon which Harry Pyle appealed to this court. Harry Pyle was given permission to file and did file a typewritten brief in this court instead of the printed brief. It is not available to us because it was not preserved as our rules require for printed briefs. The state filed a printed brief and about the questions we are considering argued as follows:

"The appellant's fifth complaint is, that the court overruled the motion for a new trial.

"His argument seems to be that because he had never heard of the fact that August Reiter had stated that he heard the name of 'Monk,' 'Wing,' or 'Speed' used at the time of the robbery the motion for a new trial should have been sustained. August Reiter was not a witness at the trial, and was dead because the defendant and his conspirators had shot him. There is no testimony in the record anywhere about 'Wing' or 'Speed,' and if there were, what would it avail the defendant in this case? The fact that the murderers may have gone under assumed names would not help out the defendant. The

appellant also in this numbered item complains because Bud Richardson, who was tried by a jury after the Harry Pyle case, was found not guilty. The fact that the jury in the Bud Richardson case may have made a mistake and brought in a wrong verdict certainly offers little consolation to the defendant in this case, and certainly does not warrant a reversal of the defendant's conviction. It is certainly just as probable, to say the least, that the jury in this case made a mistake. The fact that three persons committed a crime and one of them comes clear does not require a discharge by the court after conviction of the other two."

Our opinion did not consider the point as of sufficient importance to give it more than passing attention. Our statute requires that the names of all persons the state intends to use as witnesses at the trial of one charged with a criminal offense shall be indorsed on the information. This is a safeguard we give a defendant so that he will not be surprised at his trial. There is no claim here but that the names of all witnesses used by the state were so indorsed.

The petitioner next set out an excerpt from the record of the testimony of Vance Houdyshell, who was a witness for the defendant in the case of *State v. Richardson*, and alleges that it was suppressed. This testimony was to the effect that he was chief of police of Great Bend and that he went to the hospital on the evening of December 24, 1934, and saw August Reiter for about ten minutes; that he asked him if he heard any names called at the time the robbers were there and that he said he heard the name "Monk" mentioned, and one of them went by the name of "Speed" or "Wing."

The petition then alleged that Houdyshell was subpoenaed by the state in the case of *State v. Pyle* but was never called to testify. It then alleges that counsel for Harry Pyle testified at the hearing of the motion for a new trial that he knew nothing about August Reiter having talked to Houdyshell and had he known about it he would have introduced it at the trial of Pyle. The petition then sets out an excerpt of the cross examination of Houdyshell when counsel for the state asked Houdyshell—

"By Mr. Garvin: Was it Flynn or Wing that he heard? A. No, I didn't hear the name Flynn.

"Q. You didn't hear the name Flynn? A. No."

The petition then contains the following paragraph:

"This petitioner states that this cross-examination of Mr. Houdyshell shows definitely that the prosecution knew that Mr. Houdyshell had had this conversation with Mr. Reiter at the hospital, or they would not have asked Mr. Houdyshell on cross examination, 'was it Flynn or Wing?' that he heard. The name Flynn was a name that had been mentioned to the prosecution and if

it was the name Flynn should have been introduced into the trial of this petitioner and not withheld or suppressed along with the other names testified to by Mr. Houdyshell."

The foregoing paragraph also is more an argument than a statement of fact. If, however, it be given a liberal interpretation it is no more than a statement that Houdyshell knew something that he did not tell counsel for Pyle. Houdyshell was not in charge of the prosecution. He was not an official of the county where the crime had been committed and the trial held. If every failure of a witness to tell counsel for the defendant some fact bearing on the case should be held to constitute a reason why one should be released on a writ of habeas corpus after being convicted then there never would be any finality to a conviction. The same reasoning applies to this proffered testimony, as has been set down here as to the Caraway testimony.

These allegations do not set out sufficient issues of fact to require the appointment of a commissioner.

In a portion of the petition which he denominates section II, petitioner sets out an allegation as follows:

"Attached hereto is the original transcript of the case of *State of Kansas v. Murl Hudson*, No. 8,110, of a part of the evidence and proceedings of the trial in the District Court of Stafford County, Kansas, marked Exhibit B, and making a part hereof. Petitioner further states that:

"Reading the transcript, Exhibit B, and reviewing the testimony of John Schriner, Exhibit A, when taken together, it is apparent that this petitioner cannot be guilty of the crime as charged since Schriner states definitely that he could have identified the participants in the crime if he ever saw them again, and Exhibit B states definitely who were the participants and how the crime was committed."

Here petitioner apparently misconceives the nature of this proceeding. That paragraph is an argument as to the guilt or innocence of Pyle. That has already been determined. [The purpose of this proceeding is to try out his claim that rights guaranteed him by the federal constitution were violated or more specifically, whether those in charge of the prosecution used perjured evidence knowing it to be perjured or suppressed evidence favorable to the defendant.] It was for a determination of those issues that the United States Supreme Court reversed our former judgment and remanded the case for further proceedings. In order that those issues might be determined properly and in conformance with the opinion of the United States Supreme Court we directed the peti-

tion to be made more definite and certain in the particulars set out early in this opinion. The allegations of section II have no place in this amended petition. Out of the abundance of precaution, however, we have examined the allegations and checked them with the records, to which reference is made. It will be noted that in section II petitioner in speaking of the testimony of Schriner says "Since Schriner states definitely that he could have identified the participants in the crime if he ever saw them again." An excerpt from the transcript of the testimony of Schriner to which petitioner refers is as follows:

"MR. SCHRINER, witness.

"By MR. GARVIN:

"Q. Mr. Schriner, you have seen the defendant, Harry Pyle, sitting at the end of the table there, with that white shirt and blue necktie on. A. Yes.

"Q. You are not acquainted with him personally? A. No.

"Q. I will ask that Mr. Pyle stand, please.

"MR. SHAFFER: Stand, please (defendant stands).

"By MR. GARVIN:

"Q. I will ask whether any of the bandits were about the height of this defendant.

"MR. SHAFFER: To which we object as incompetent and irrelevant, and leading and suggestive. Let him describe the bandits.

"THE COURT: Well, he can ask him whether they were about his size. Overruled.

"WITNESS: Well, he was just about the size—the size of one of them.

"By MR. GARVIN:

"Q. Do you remember which one the defendant is about the size of, Bandit No. 1 or 2? A. No. 1.

"THE COURT: The second one that you claim entered the house you call No. 1.

"WITNESS: Yes.

"By MR. GARVIN:

"Q. No 1 is the fellow who came in second, isn't he? A. Yes.

"Q. And you think the defendant, here, is about the same size? A. Yes, just about the same size, only he appeared to be a little younger man—that is all the difference I could see.

"Q. You said that one of these bandits shot August Reiter, which one— Bandit No. 1 or Bandit No. 2? A. Bandit No. 2.

"THE COURT: That was the first man who came into the house?

"WITNESS: Yes.

"*Redirect Examination by Mr. Garvin.*

"Q. Mr. Schriner, which could you see the best, the butcher knife or the man's face? A. Well, both was about same—see one about as good as the other.

"Q. Would you swear that this is not one of the men that was up there?

"MR. SHAFFER: Wait a minute. We object to that. That is not proper

cross-examination. That is a negative. Cross-examining his own witness.

"The Court: Yes, sustained. I think the question is objectionable.

"Mr. Garvin: That is all."—(Transcript, *State v. Harry Pyle,* No. 7834, Stafford District Court, pp. 49, 50.)

We are unable to find any statement of Schriner that he could have identified any of the bandits.

In section II petitioner makes the further statement:

"And Exhibit B states definitely who were the participants and how the crime was committed."

Exhibit B is the transcript of the testimony in the trial of *State v. Hudson* where Babe Pyle and one Stover and a woman who was living with Hudson testified that Babe Pyle, Stover and Hudson committed the crime. Babe Pyle and Stover were confessed bandits. It would not be strange if Babe, being the son of Harry, and Stover being a bandit, should tell a story which would clear Harry Pyle. Furthermore their testimony in the case of *State v. Hudson* could be substantially true and still Harry Pyle could be guilty of the murder and robbery because he counseled, aided and abetted in their commission.

The conclusion petitioner draws from the records in which reference has been made are not warranted.

We have concluded that the amended petition does not comply with our order that it be made more definite and certain in certain particulars and the motion of the respondent that it be dismissed should be sustained and the writ denied. It is so ordered.

Parker, J., not sitting.